## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Colonel Karl E. Nell
5 Lawhorn Road
Stafford, VA 22554
United States

   Plaintiff

  v.


The Honorable Christine E. Wormuth
Secretary of the Army
US Army
101 Army Pentagon
Washington, DC 20310-0101

The Honorable Lloyd J. Austin III
Secretary of Defense
1000 Defense Pentagon
Washington, DC 20310-1000

Army Board for the Correction of
Military Records
251 18th St. South, Suite 385
Arlington, VA 22202-3531

And, United States of America

   Defendants

Case No.:


COMPLAINT FOR SETTING ASIDE
FINAL AGENCY DECISION AS
UNLAWFUL UNDER THE
ADMINISTRATIVE PROCEDURE ACT
AND FOR TEMPORARY INJUNCTION.

## COMPLAINT FOR SETTING ASIDE FINAL AGENCY DECISION AS UNLAWFUL UNDER THE ADMINISTRATIVE PROCEDURE ACT AND FOR TEMPORARY INJUNCTION

In the spring of 2009, Plaintiff Colonel Karl E. Nell ("Col. Nell") was tasked with turning

around a badly underperforming U.S. Army Reserve military intelligence battalion, the 323rd

("323rd"). The unit was failing to meet deployment commitments and its readiness was at the

bottom of the U.S Army Reserve's Military Intelligence Readiness Command ("MIRC"). He was forewarned that he would face pushback from personnel within the 323rd, which had a broken command climate, even to the level of personal attacks.

Under his command, the 323rd was transformed, and, by the time he left, it was one of the best units in the MIRC. Most of the personnel of the 323rd welcomed the change in attitude by the unit's leadership and supported Col. Nell's plan to transform the struggling battalion. But some didn't. One of those officers, Major Zeruto (then Captain Shin), repeatedly and flagrantly attempted to sabotage his efforts, while also demeaning her subordinates and harming their careers through both her actions and failure to perform her administrative duties. After a long track record of failure and refusal to fulfil the duties of her position, Col. Nell gave her a less than fully favorable assessment and, when performance did not improve, subsequently reassigned her to a different position within the battalion.

These justified actions formed the basis for a whistleblower reprisal complaint by Major Zeruto. The Department of the Army Investigator General ("DAIG"), following a badly flawed investigation, wrongfully found that these complaints were substantiated. These two wrongful findings of whistleblower reprisal have followed Col. Nell since and mark a stain on his legacy of service in the Army. His military record and personnel file will long outlast him and as a basic principle, they should not convey false allegations to future generations.

In addition, these wrongfully substantiated false allegations have severely hampered Col. Nell's career, delaying his promotion to full Colonel for nearly four years and also all but preventing his potential promotion to Brigadier General. This was despite Col. Nell excelling in every position he was placed in and him being highly recommended by all of his superiors. More than just that, with Col. Nell's "up or out" mandatory retirement date coming on June 1st, 2022,

the false allegations, by preventing his promotion, are also bringing his stellar career to a premature end.

In the time since the investigation, he has repeatedly submitted substantial amounts of unconsidered evidence to both the DAIG and the Army Board for the Correction of Military Records ("ABCMR"). After repeated investigations, in 2017 the ABCMR finally realized the truth of the matter and ordered the Department of Defense Office of Inspector General ("DoDIG") to reconsider its investigation. Following yet another flawed and cursory review, which ignored the substantial additional evidence submitted, DAIG failed to reinvestigate as requested by ABCMR and simply upheld the original findings. The ABCMR subsequently wrongfully upheld this decision twice on two spurious legal grounds. First, it declared that it was not an investigatory body and could not assess the investigation, despite the matter before it being entirely founded on an already established record. The second time, it held that nonbinding legislative history overrode its clear statutory grant of authority to correct all records, and that it could not expunge findings of whistleblower reprisal.

This Court now has the opportunity to correct this manifest injustice and clear this wrongful stain on the career of a stellar soldier. If Col. Nell exhibited fault, it was in granting too much leeway to an openly insubordinate, deeply selfish, and vindictive subordinate. ABCMR's recent refusals reassess either the original investigation in light of new evidence or the DoDIG response to its reinvestigation request are both directly contrary to ABCMR's inherent statutory grant of authority under 10 U.S.C. § 1552.  These recent decisions equating to a failure to act should therefore be set aside pursuant to the Administrative Procedure Act ("APA"). As a violation of the APA only results in the vacating of a decision, necessitating a further application, in the interest of judicial economy the underlying matter should be remanded to the

ABCMR for one final assessment as to whether it will uphold the DAIG report. Should the

ABCMR continue to refuse to admit the reality of the situation, this Court should set aside their

decision under the APA as arbitrary and capricious. While this happens, these wrongful actions

should not continue to unjustly harm Col. Nell's career. Should he be on the current Order of

Merit List ("OML") for nomination for promotion to Brigadier General, this Court should enjoin

his potential removal from the list when the current members are supplanted by the new

candidates for promotion at the start of 2022.

## I.     JURISDICTION AND VENUE

1.  This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal jurisdiction question), 1346(a)(2) (civil action against the United States…founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department….), and 1361 (action to compel an officer or employee of the United States to perform his duty). Hatheway v. Secretary of the Army, 641 F.2d 1376, 1379-80 (9th Cir. 1981), cert. denied, 454 U.S. 864 (1981).

2.  Under 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction, any court of the United States…may declare the rights and other legal relationships of any interested party seeking such declaration, whether or not further relief is or could be sought." Under 28 U.S.C. § 1361, the court may issue any "an order to compel an officer or employee of the United States to perform his duty."

3.  Venue in this district is proper pursuant to §§ 1391(e) and 1402(a) because the Defendants are located at the addresses stated in the caption and no real property is involved in the action.

## II.    THE PARTIES

4.  Plaintiff Colonel Karl E. Nell is a Colonel in the United States Army.

5.  Defendant Christine Wormuth acts on behalf of the United States of America in her official capacity as the Secretary of the Army.

6.  Defendant Lloyd J. Austin, III, acts on behalf of the United States of America in his official capacity as the Secretary of the Defense.

7.  The Army Board for the Correction of Military Records ("ABCMR") is the civilian board charged under statute with exercising the Secretary of the Army's right to correct military records to address error or injustice.

8.  Defendant United States of America is the U.S. government.

## III.    STATEMENT OF THE FACTS

**Col. Nell takes command of the 323rd Military Intelligence Battalion with the task of turning around a struggling unit.**

9.  Col. Nell assumed command of the 323rd in April of 2009.

10. Col Nell's predecessor at the 323rd had been relieved for cause due to the 323rd failing to meet deployment commitments, having a readiness near the bottom of the 11 battalions in the MIRC and being infected with a deep culture of complacency. Exhibit 1(k).

11. The Chaplain of the 323rd, Major Robert Carter, a combat-decorated former infantry officer, described its state at the time Col. Nell took command as "underperforming or even non-performing." Exhibit 1(d).

12. Col. Nell was tasked by Lieutenant General Jody J. Daniels (Lt. Gen. Daniels) with turning around the unit's performance and ending that culture of complacency. Exhibit 1(k).

13. Today, Lt. Gen. Daniels is Chief of the Army Reserve and Commander of U.S. Army Reserve Command ("USARC") – the most senior officer in the Army Reserve – however, at the time of these events, she was Col. Nell's intermediate rater, a Colonel in command of the Theater Support Command ("TSC") within the MIRC. Exhibit 1(k).

14. The end goal of his efforts was to repair the 323rd's fractured working relationship and mission-effectiveness in support of its the 66th Military Intelligence Brigade ("66th MI") – the 323rd's operationally-aligned, active-duty headquarters. Exhibit 1(k).

15. When Col. Nell took command, the command climate of the unit was completely unaccustomed to strong leadership and exemplified a culture of complacency, with officers and NCO's often resisting initiatives from above to improve performance. Exhibit 1(k).

16. Lt. Gen. Daniels expected that Col. Nell, as a result of the rot which had seeped into the 323rd, would face pushback from the unit and its command structure, including personal attacks. Exhibit 1(k).

17. Col. Nell's plan for the 323rd, which Lt. Gen. Daniels supported, was threefold:

a.  First, a series of progressively more complex field problems for all the companies under his command to improve unit cohesion and skills.

b.  Second, to ensure significant voluntary participation by the members of the 323rd in EUCOM's annual Austere Challenge NATO exercise, which would help repair working relationships with the 66th Military Intelligence Brigade while also improving unit capabilities.

c.  Third, to have the commander of Alpha Company simultaneously serve as the Analysis and Control Element ("ACE") Chief since Alpha Company personnel comprised the majority of this element (the remainder having been deployed for Operation Iraqi Freedom).  Having one officer assume both administrative and mission responsibility ensured unity-of-command and was recognized as prudent preparation for future reintegration of the deployed personnel back into the company. Exhibit 1(k).

18. Col. Nell's plans would eventually bear fruit, with his successor in command of the 323rd describing it as "high performing and well-run," a complete reversal from the abysmal state in which it was when Col. Nell first took command. Exhibit (1c); Exhibit 1(d); Exhibit 1(k).

**Major Ligeia M. Zeruto takes command of Alpha Company and the battalion ACE.**

19. As stated above, when Col. Nell took command of the 323rd, he planned to dual hat the commander of Alpha Company and the ACE, a decision which Lt. Gen. Daniels supported. Exhibit 1(k).

20. The purpose of Alpha Company was to staff the ACE, which, during war-time, would serve to produce the all-source intelligence picture for a theater commander (a three-star general).

21. This meant that, on paper, ACE chief was an O-5 position, equivalent in rank to the battalion commander.

22. In practice, to ensure unity of command, the position is very rarely filled by an O-5, and oftentimes the battalion commander personally serves as the ACE chief, should the whole battalion deploy.

23. In typical experience, Alpha Company personnel are simply integrated into pre-existing active-duty led ACEs, and the required seniority for a reserve ACE chief is that of a Major (O-4).

24. Given that the purpose of Alpha Company was to staff the ACE, this meant that having a separate commander for each meant having two people with the responsibilities for the same personnel.

25. This had resulted in significant complications for the portion of Alpha Company that had been deployed when Col. Nell first took command, as Major Zeruto's predecessor in command of Alpha Company and Major Ohlmann (then a Captain and serving as deputy ACE chief) were co-equal in rank with responsibility for the same personnel – violating unity of command.

26. Embarrassingly for the 323rd, this had required the active-duty ACE chief to step in to adjudicate the two captains' duties while in theater, something Col. Nell wished to avoid with the personnel at home station.

27. Some parties interviewed by the DAIG were not aware of this or Col. Nell's reasons for dual hatting the position, resulting in this action being taken as evidence of him being out of touch with the needs of the battalion, despite it being supported by Lt. Gen. Daniels. Exhibit 1(k).

28. In 2009, Col. Nell selected Major Ligeia M. Zeruto ("Major Zeruto"), then Captain Ligeia M. Shin, to both command the Alpha Company personnel who had not been deployed to Iraq, and to fill the position of ACE chief for the battalion.

29. Major Zeruto was counseled on her position responsibilities by Col. Nell and accepted the scope of responsibility when she took command of both Alpha Company and the ACE on March 19, 2009.

30. Upon assuming command, Major Zeruto immediately began what would become a long track record of failing to perform routine duties that did not personally interest her, by not completing the first tasks given to her by Col. Nell: completing the online Commander's Safety Course and enrolling in the Pre-Command Course. Exhibit 3(d); Exhibit 1(h).

31. These were mandatory courses under US Army Reserve Command policy for all new company commanders and failure to complete them not only reflected poorly on the professionalism of reticent commanders, but more importantly, adversely impacted their ability to protect the welfare of their soldiers until addressed. Exhibit 3(d).

32. Col. Nell informally counseled her for this failure on March 11, 2010, nine months after she took command (a reasonable follow-up period since wait times from enrollment to start-date for the Pre-Command Course were typically 6-months), since both of those tasks had yet to be performed. Exhibit 3(d)

**Major Zeruto's first, favorable, Officer Evaluation Report and the complete failure of Alpha Company during the first field problem.**

33. On December 4, 2009, Major Zeruto requested an early closeout of her Officer Evaluation Report ("OER") rating period in preparation for a promotion board.

34. This would result in her OER rating period ending prior to the first Alpha Company field problem, scheduled for February 20 to 21, 2010. Exhibit 3(c).

35. Despite misgivings, Col. Nell agreed to have her OER close out early, accepted her suggested comments, and even went out of his way to emphasize the urgency of the matter to her senior rater on January 12, 2010. Exhibit 3(a); Exhibit 3(b).

36. Though Col. Nell had emphasized urgency in order to ensure that Major Zeruto's OER would be closed out before the promotion board suspense date, the senior rater did not sign it in time to meet the early suspense. Exhibit 3(c).

37. This extended what would otherwise have been a truncated rating period (originally requested to meet Major Zeruto's board suspense) through March 19, 2010 thereby adding many additional months which were not covered by Col. Nell's rater comments that had been submitted in January of 2010.

38. It was during this extended period after Col. Nell's rating, but retroactively included within the first rating period, that Alpha Company performed its first planned field problem. Exhibit 3(b).

39. Alpha Company's performance was disastrous, described by the 323rd's Command Sergeant Major (CSM) Eric Garrison as "the worst meltdown of company leadership" he had observed in a long time. Exhibit 1(l).

40. CSMs are the most senior enlisted member of a unit, the longest serving, and a critical source of experience and expertise for the unit.

41. Most importantly, CSM Garrison was the only first-person witness (other than Col. Nell) to observe every field problem conducted by every company in the battalion rendering his comparative analysis based upon both past experience and first-hand knowledge uniquely relevant.

42. Major Zeruto failed to perform the necessary detailed planning for the field problem that was within her exclusive purview as Alpha Company commander. Exhibit 1(j).

43. The personnel of Alpha Company were also apparently unhappy at having to perform the field problem. Exhibit 1(j).

44. Upon Major Zeruto's instigation, Alpha Company's advance party inflated their assessment of the cold weather risk for the field problem in order to cancel the event. Exhibit 1(j).

45. This was in line with other actions by Major Zeruto where she would rally Alpha Company against battalion initiatives she wished to challenge by deliberate presenting them in the worst possible light. Exhibit 1(j).

46. Instead of performing the field problem, the company conducted local convoy operations by driving around Fort Meade several times and then congratulated themselves with a pizza party. Exhibit 1(j).

47. Both CSM Garrison and the noncommissioned officer in charge of operations (NCOIC) for Alpha Company, SFC Green ("NCOIC Green") attested that weather conditions did not merit canceling the field problem. Exhibit 1(j); Exhibit 1(l).

48. It is important to stress that Col. Nell submitted his comments for Major Zeruto's first OER *prior* to the first field problem at her request and intended the first field problem to be included within her second rating period.

**Major Zeruto fails to assist in the completion of the top priority assigned to the 323rd by its commanding unit: a high participation rate in the Austere Challenge exercise.**

49. A key element in Col. Nell's plan to reestablish the 323rd's operational capabilities and its working relationship with the 66th Military Intelligence Brigade was strong participation in EUCOM's annual Austere Challenge exercise. Exhibit 1(k).

50. A high participation rate by the 323rd was the top priority for the battalion assigned by Col. Napoleon W. Stewart, commander of the 66th MI. Exhibit 1(k).

51. It was the task of the company commanders to encourage the members of their companies to volunteer for participation in the exercise, or to order participation where the member had otherwise not performed their required two weeks of annual training. Exhibit 3(w).

52. Major Zeruto took little to no action in ensuring the fulfillment of this task, as compared with her peer company commanders and her successor. Exhibit 1(j); Exhibit 1(l).

53. At the start of Training Year 2010-2011, each of the three company commanders had agreed to fill a number of billets for Austere Challenge, based on the size of their companies.

54. Alpha Company was assigned 25 billets for the exercise. Exhibit 1(l); Exhibit 4(a): Austere Challenge Manning Table.

55. By September 27, 2010, Major Zeruto had only been able to secure 4 of the 25 billet commitments for Austere Challenge to which she had previously agreed. Exhibit 3(w).

56. Although NCOIC Green, as both the NCO in charge of training for the company and acting company first sergeant, would normally be key to helping fill these commitments, Major Zeruto never asked him to participate in this task. Exhibit 1(j).

57. By contrast, both Bravo and Charlie companies (each individually comprised of one-half to one-fourth the number of personnel as Alpha) had secured 9 commitments each by that point, 60% and 90% of their agreed upon contribution. Exhibit 1(l).

58. This was the point where major Zeruto left early to go on maternity leave with command of Alpha Company being passed to Captain Holtz.

59. In the space of only one month, Captain Holtz was able to secure 10 additional commitments for the exercise, more than twice as many as Major Zeruto had secured, bringing Alpha Company's volunteer rate into line with Bravo Company. Exhibit 1(l); Exhibit 4(a).

**Major Zeruto and Alpha Company's neglect of professional development education courses as part of its annual training, despite battalion guidance.**

60. The above-mentioned failure to secure commitments for Austere Challenge was reflective of Major Zeruto's lack of effort in ensuring both her company's fulfillment of mission commitments and professional development. Exhibit 1(j).

61. In accordance with US Army Reserve Command directive dated March 2, 2007, "Non-commissioned Officer Educational System (NCOES) Bottom Line for the Unit Commander, First Line Leader, and Soldier", it was the official published battalion policy that company commanders, in the strong words of the directive would "demand and facilitate" enrollment and participation in the Army educational system for all battalion personnel as the number two annual training priority. Exhibit 1(i).

62. This was an unpopular directive with command teams since soldiers at school were unavailable for company missions. It was also unpopular with many soldiers since schooling was often difficult. Col. Nell enforced it since the long-term professional development and promotability of his soldiers was more important than immediate benefit to himself or the unit. Exhibit 1(i).

63. While Bravo and Charlie companies generally followed this guidance, Alpha Company, during Major Zeruto's tenure, required significantly more attention by battalion staff to ensure that it was performing its training, schooling, and administrative duties. Exhibit 1(i).

64. Major Zeruto failed to assist in identifying the Alpha Company personnel who required professional development education ("PDE") and refused to assist the battalion Staff Operations and Training Specialist, Jared Chichester ("SOTS Chichester") in his efforts to faithfully execute battalion guidance. Exhibit 1(i).

65. Chief Warrant Officer Two Allene Pemberton ("CW2 Pemberton"), the full-time staff member assigned to Alpha Company, stated her belief, based on personal observation and her review of weekly staff meeting reports, that Major Zeruto exhibited a continual reluctance to perform routine company administrative tasks, such as evaluation reports, or ensuring PDE enrollment. Exhibit 1(h).

66. This not only increased the workload of both company and battalion staff, but was also evidence that supported CW2 Pemberton's belief that Major Zeruto showed a "complete disregard for the battalion goals and soldier welfare" and that she was "motivated solely by self-interest." Exhibit 1(h); Exhibit 1(i).

67. Unlike Bravo and Charlie companies, where this problem was rare to non-existent, Alpha Company, under Major Zeruto, frequently allowed company personnel to change annual training plans at the last minute, imposing significant burdens on battalion staff to keep track of the last-minute cancellations. Exhibit 1(i).

68. Major Zeruto also refused to engage in the proper planning required to ensure that her personnel did not become "no-shows" at their scheduled PDE courses – often requiring frequent battalion intervention in order to ensure that soldiers were prepared for their courses or were replaced. Exhibit 1(i).

69. This frequently required replacing last minute "no-shows" with personnel from units outside of the 323rd, in order to avoid wasting slots in the Army's professional development courses, albeit to the detriment of battalion soldiers professional development. Exhibit 1(i).

70. By contrast, Bravo and Charlie companies' made full efforts to ensure compliance with battalion guidance. Exhibit 1(i).

71. By November 7, 2010, Major Zeruto had failed to schedule required PDE for 18 of her officers and warrant officers and 6 of her NCOs, while Bravo and Charlie company only had a combined total of 7 failures to schedule required PDE, all for NCOs. Exhibit 1(i).

72. NCOIC Green, SOTS Chichester, and CW2 Pemberton specifically blamed this on a lack of will by Major Zeruto to communicate or implement battalion guidance that she did not personally agree with. Exhibit 1(h); Exhibit 1(i); Exhibit 1(j).

73. Major Zeruto failed to manage the professional development not only of Alpha Company personnel, but also for herself, as exemplified by her failure to attend the mandatory Pre-Command Course or to enroll in Intermediate Learning Education required of all majors. Exhibit 1(i); Exhibit 1(j); Exhibit 3(d).

**Major Zeruto fails to prepare her company for the second field problem; during the problem Col. Nell accidentally uses a phrase whose modern colloquial meaning had changed to having a sexual nature.**

74. Major Zeruto's lack of leadership continued to cause problems for Alpha Company during the next field problem.

75. While Bravo and Charlie companies had been completely meeting training goals by their second field problem, Alpha Company only completed some of its goals in its second problem. Exhibit 4(b) Field Problems Assessment Table.

76. This was caused by Major Zeruto completely failing to engage in prior preparation for the problem, resulting in a lack of substance in the training. Exhibit 1(j); Exhibit 1(l).

77. This required Col. Nell to directly intervene in the field exercise and to speak with Alpha Company.

78. Col. Nell explained his training approach to Alpha Company, emphasizing the need to steadily build basic capabilities and skills before then progressing to more advanced materials. Exhibit 1(f).

79. Col. Nell also explained his approach to Lt. Alvaro De La Iglesia, Alpha Company Executive Officer and acting commander during the field problem, who had come to Col. Nell with his concerns. Exhibit 1(f).

80. Lt. De La Iglesia realized the value of Col. Nell's approach during this conversation, and later reflected on the poor execution of Col. Nell's intent for the field problem by Alpha Company. Exhibit 1(f).

81. Although his discussion with Alpha Company was successful in obtaining increased team buy-in, as revealed by the company's significantly improved performance in the third exercise, Col. Nell made a valid military analogy to the days before the invention of smokeless powder that was purposefully taken out of context by Major Zeruto (who was not present for the discussion) and accidentally by Lt. De La Iglesia (who left the meeting early to answer a phone call). Exhibit 1(f).

82. When misfires were common in unreliable firearms, the necessity of carrying multiple weapons often made the difference between life and death; similarly, in the case of Alpha Company, Col. Nell wanted to communicate the need for multiple field training exercises lest the team "shoot your wad" to detrimental effect as apparently had occurred in the sub-optimal second field problem.

83. The need for even a single field training exercise was contentious in the eyes of many company personnel, who had just returned from overseas deployment during which they operated exclusively from air-conditioned buildings, thus necessitating the discussion.

84. Merriam-Webster defines wad as, "a soft plug used to retain a powder charge or to avoid windage especially in a muzzle-loading gun" and "a roll of paper money."[1]

85. This statement was later grossly incorrectly recorded by the DAIG Report DIH 11-6066 ("DIH 11-6066") as "blowing our load" on page 6, and then again incorrectly, but less so this time, at page 8 as "blowing our wad". Exhibit 6: DIH 11-6066 at 6, 8.

86. This reflects the fact that multiple witnesses have had different recollections of what was said, including Lt. De La Iglesia and Lt. Col. Mullis, the investigating officer for the comments, who remembered the phrase as "blowing our wad" despite the actual phrase used being "shoot your wad." Exhibit 1(b).

87. Col. Nell did not intend for this to be a sexual metaphor, as he was using it as a military analogy, and he is far from the only older person to accidentally discover that the phrase has now accrued a sexual connotation; Senator Orrin Hatch, for example, faced an identical issue when he used the phase in its original sense.[2]

88.  Some members of Alpha Company were surprised or shocked by Col. Nell's use of the phrase. Exhibit 1(f).

89. Lt. (now Captain) De La Iglesia, upon Major Zeruto's request, made an initial MFR on August 29, 2010, documenting the incident. Exhibit 1(f).

90. In a subsequent MFR, Lt. De La Iglesia clarified his initial MFR and stated his belief that Col. Nell did not have any purposeful discriminatory or malicious intent when using the metaphor, that Col. Nell accidentally disregarded the modern colloquial meaning of the phrase, and that he had never witnessed Col. Nell ever use a sexual metaphor or make statements which could be interpreted as gender discriminatory. Exhibit 1(f).

91. Col. Nell, received verbal counselling for his use of the phrase, and has never before nor since received any complaints about use of inappropriate language.

92. Due to the failure of the second field problem, Col. Nell engaged in substantial verbal counseling with Major Zeruto, who then tendered a resignation email later that day; after discussions with Col. Nell, Major Zeruto decided to remain in the unit. Exhibit 3(j).

**Major Zeruto's general failure to attend to the administrative tasks of her company and harsh treatment of subordinates.**

93. Though treated leniently by Col. Nell, despite the above-mentioned problematic behavior, Major Zeruto acted very harshly towards subordinates.

---

[1] https://www.merriam-webster.com/dictionary/wad
[2] http://www.slate.com/blogs/browbeat/2017/08/07/orrin_hatch_and_the_etymology_of_shot_their_wad.html

94. Due to a combination of soldier and battalion error, a group of soldiers failed to appear for soldier readiness processing in the summer of 2010. Exhibit 3(i).

95. Major Zeruto declared her intention to Col. Nell to issue charges under Article 15 of the UCMJ to the soldiers and incited other company commanders do the same. Exhibit 3(i).

96. Col. Nell immediately put an end to the suggestion as an Article 15 would be the end of those soldiers' careers and written counseling was better suited to the matter. Exhibit 3(i).

97. Major Zeruto would also engage in retaliation against a member of her company, NCOIC Green, after he had complained to the battalion executive officer about her failure to return phone calls when he was on emergency leave. Exhibit 1(h); Exhibit 1(j).

98. While she had earlier approved an early report date to his new unit, to which he was permanently changing station, when she learned of his complaint she immediately rescinded this grant that day and then gave him a substandard evaluation for his NCO OER that directly conflicted with her prior appraisals of him. Exhibit 1(h); Exhibit 1(j).

99. More generally, as has been established above, Major Zeruto failed to attend to the administrative duties of her company.

100.    This included failing to organize a transition ceremony for the Alpha Company change in command of from Captain Heymann to her, upon Captain Heymann's permanent change of station from the unit after return from Iraq, despite Col. Nell's explicit request that she conduct such ceremonies. Exhibit 3(g).

**Major Zeruto fails to complete the rebasing study for Alpha Company's remote detachment in upstate New York.**

101.    One of the objectives for the 323rd given by Lt. Gen. Daniels when Col. Nell took command was to complete a longstanding and languishing rebasing study for the closure of the 323$^{rd}$s remote detachment on Staten Island, New York. Exhibit 1(k).

102.    Its low operational utility outweighed the significant cost of keeping it open, but local recruiting had prevented the previous attempts to close the detachment through attrition.

103.    With the support of Col. Napoleon Stewart of the 66th MI Brigade, Col. Nell instead planned to follow the study's recommendation for a formal closure.

104.    Part of this closure plan required a plan for re-stationing detachment personnel and equipment.

105. This was originally the task of the battalion executive officer Major Katherine Long, but, when other priorities emerged, Col. Nell delegated the task to Major Zeruto, as she had begun a CO-ADOS full time duty tour with the battalion for 179 days, on her own request after her planned civilian position as a lobbyist had fallen through.

106. Though necessary for the goals of the Army as a whole, the rebasing project was unpopular with Alpha Company personnel, as closing the Staten Island detachment would require the Alpha Company personnel stationed there to have to travel farther to perform their duties.

107. In addition, Major Zeruto received some tacit resistance from Major Turpin, the former 323rd executive officer who was reassigned as MIRC Force Structure Officer by Lt. Gen. Daniels prior to Col. Nell's assumption of battalion command.

108. After a single phone call with Major Turpin, she completely ceased work on re-stationing her personnel, while misinforming Col. Nell about the progress of implementing the study. Exhibit 1(l).

109. Major Zeruto also used the rebasing initiative to get out of another task Col. Nell had assigned to her.

110. Col. Nell requested that she visit the detachment prior to a specified date, which she committed to, but then failed to do so by the deadline requested.

111. She instead chose to perform this visit to Staten Island, New York, on the only day when Col. Nell, CSM, XO, and S3 all had offsite commitments during a 323rd battle assembly, and after Col. Nell had explicitly delegated responsibility to her, as acting battalion commander to remain in the battalion's Fort Meade headquarters.

112. This left no field grade officer in charge of the unit during that battle assembly.

**Major Zeruto completely fails to prepare for the third field problem for Alpha Company; responsibility for planning the field problem is transferred to other personnel.**

113. On August 21, 2010, Col. Nell transferred responsibility for preparing for Alpha Company's third field problem from Major Zeruto to Major Ohlmann, the deputy ACE chief and Chief Warrant Officer Two Rickey Sturdivant ("CW2 Sturdivant") of Alpha Company due to an obvious absence of leadership and lack of even rudimentary progress on the part of Major Zeruto. Exhibit 1(g).

114. Major Zeruto had advanced warning of the third field problem since at least December 2009 – but actually earlier when she participated in battalion meetings during which the field problem dates were first selected – and again when formal publication of the battalion yearly training calendar occurred in May of 2010. Exhibit 1(g).

115.    Normally preparation for such a field problem would take about six months of work. Exhibit 1(g).

116.    Despite this, when Major Ohlmann and CW2 Sturdivant received responsibility for the problem in August, Major Zeruto had performed absolutely no work to prepare for it. Exhibit 1(g).

117.    Under a tight two-month deadline, Major Ohlmann and CW2 Sturdivant managed to complete the preparations for the problem, which turned out to be a significant success for Alpha Company and the battalion. Exhibit 1(g).

118.    Alpha Company's third field problem, thanks ultimately to Major Zeruto's abrogation of responsibility necessitating Col. Nell's intervention,  was a significant success, resulting in it meeting all command training goals and finally coming into line with Bravo and Charlie companies' performance. Exhibit 4(b).

119.    The field problem was such a sufficient success that it was featured in 2011 in the MIRC's official magazine "Always Engaged." Exhibit 1(g).

**Major Zeruto makes her first of six protected communications.**

120.    On August 27, 2010, a bit more than one month after receiving strong verbal counseling for her failure to prepare the second field exercise, and six days after responsibility for the third field exercise was transferred to Major Ohlmann and CW2 Sturdivant, Major Zeruto made her first protected communication. Exhibit 6 at 7.

121.    This was a complaint to Theater Support Command alleging that Col. Nell had used inappropriate language during the second field problem, which she had not been present for. Exhibit 6 at 7.

122.    Col. Nell received verbal counseling about his use of language from the Theater Support Command commander, and the incident remained an isolated one for the entirety of his time in command of the 323rd.  In fact, at no time during his tenure or afterward even including the moment of occurrence, did any Alpha Company or 323rd personnel refer to this incident as an issue either publicly or privately to Col. Nell.  Exhibit 6 at 8.

123.     Col. Nell did not know that Major Zeruto had made the protected communication; he sought her out to discuss the incident when it was brought to his attention by Col. Stratton, as he knew the complaint derived from Alpha Company and he wanted her help in resolving the misunderstanding with the least amount of disruption for her company.

124.    It was during this meeting that Major Zeruto admitted that it was she who had made the communication, which surprised and disappointed Col. Nell, as she had not attended that

field exercise, and it made clear that there was no possible mitigation for the misunderstanding.

125.    Lt. Col. Mullis, who investigated Major Zeruto's first equal opportunity complaint, later stated that one of the female officers in Alpha Company that he interviewed stated her belief that Major Zeruto had exploited the incident to "get back" at Col. Nell for their professional disagreements. Exhibit 1(b).

126.    This was in line with Lt. Gen. Daniels' warning to Col. Nell to expect pushback, and even personal attacks.

**Col. Nell and a group of Major Zeruto's peers attempt to visit her in the hospital; Major Zeruto is ordered to corrective action after yet another attempt to confront battalion personnel.**

127.    On October 16, 2010, Col. Nell, CSM Garrison, and two friends of the Zeruto family, Captain Daniel Lake and his wife Captain Kathleen Merkl – also members of the 323rd, sought to visit Major Zeruto while she was in the hospital, though she only admitted Captains Lake and Merkl to see her.

128.    Although Major Zeruto had indicated before entry into the hospital that she did not wish to have visitors, Col. Nell believed that it was the right thing to do to offer her the choice of accepting a visit that day, in order for the group to show their concern for her wellbeing.

129.    Later during his command of the 323rd, Col. Nell would be accused of showing an unequal level of concern for the wellbeing of another unit member when competing operational imperatives rendered him unable to visit them despite a track record of visiting all personnel who were hospitalized.

130.    On the morning of October 18, 2010, Major Zeruto thanked Col. Nell for the group's attempted visit in an email message. Exhibit 3(l).

131.    A few hours after that message, Major Zeruto sent out a demeaning "reply all" email publicly berating a junior battalion human resource NCO for performing his duty – i.e., requesting status from all company commanders pursuant to battalion requirements for updated company alert rosters.  It is noteworthy that Alpha Company was significantly delinquent by 60-days. Exhibit 3(n).

132.    Although all companies had been remiss in providing the alert roster information, only Major Zeruto chose to demean the human resource sergeant for doing his job. Exhibit 3(n).

133.   Major Tluczek, the battalion executive officer, contacted Col. Nell soon after, as he believed that the sergeant had acted properly and that Major Zeruto was retaliating against the sergeant because she felt he had embarrassed her. Exhibit 3(o).

134.   Col. Nell supported Major Tluczek's position and agreed that he should speak with Major Zeruto. During the heated meeting between Major Tluczek and Major Zeruto which occurred later that afternoon, Major Zeruto claimed that it was her right to confront staff about allegedly poor processes. Exhibit 3(p).

135.   She refused to accept the feedback she received from Major Tluczek concerning her treatment of battalion personnel, instead arguing that the situation was his fault and that he needed to control the behavior of his staff. Exhibit 3(p); Exhibit 7, Development Counseling Form dated October 18, 2010.

136.   She complained about the meeting later that afternoon to Col. Nell, who, in his response, instead highlighted Major Zeruto's disparate treatment of herself and her subordinates, including her harsh approach to those under her as compared to her refusal to accept criticism or address her own problematic performance in:

   a.   Failing to put into action battalion guidance concerning professional development education;

   b.   Failing to complete the rebasing study;

   c.   Failing to assist in ensuring Alpha Company's participation in Austere Challenge; and

   d.   Completely failing to prepare the company for any of the three field problems. Exhibit 3(p).

137.   In addition, Col. Nell also highlighted a communication from Col. Stewart at the 66th MI Brigade suggesting that representatives from the 323rd had informed the 66th MI Brigade that the battalion would be incapable of executing intelligence production missions due to the tempo of their field training. Exhibit 3(p).

138.   Major Zeruto was the senior officer responsible for communicating intelligence production status with the 66th MI Brigade, and the communication was in direct contradiction to both the reality of the 323rd's availability, and Col. Nell's explicit guidance concerning priorities of support. Exhibit 3(p).

139.   As a general assessment, Col. Nell used these examples to call into question Major Zeruto's will to carry out his guidance for the unit and ordered her to speak to Major Tluczek and to follow the corrective action he would advise. Exhibit 3(p).

140.   Even despite all of these issues, Col. Nell still noted her clear competence, and later significantly toned down Major Tluczek's advised corrective actions in order to help Major Zeruto save face and protect her command authority within the battalion. Exhibit 3(q); Exhibit 7.

141.   Major Zeruto signed the counseling statement written by Major Tluczek on October 26, 2010. Exhibit 8: DIH 11-6066 Roll Case Exhibit F.

142.   Major Zeruto later used the hospital visit by the group as the basis for a complaint of harassment, through an attempt to visit her without her consent, in both her second and third protected communications. Exhibit 6 at 7.

**Major Zeruto makes her second protected communication.**

143.   On October 27, 2010, one day after signing the counseling statement given to her by Major Tluczek for retaliation against the human resource sergeant, Major Zeruto made her second protected communication, a complaint to the MIRC IG alleging: (1) a failure to follow Army training doctrine, (2) use of inappropriate language, harassment, and (3) a failure to enforce the same Army values against the battalion CSM and other personnel as he did against her. Exhibit 6 at 7.

144.   The MIRC IG did not find that any of these complaints were substantiated, however, it did provide guidance to both Col. Nell and Major Zeruto in an attempt to improve their working relationship. Exhibit 1(a); Exhibit 6 at 8.

**Major Zeruto takes an unanticipated leave of absence from the 323rd for three months.**

145.   Major Zeruto was unexpectedly absent from the November battalion battle assembly, where she knew that Col. Nell intended for her to receive and sign a written counseling document based on the counseling email Col. Nell had sent to her on October 18, 2010. Exhibit 3(u); Exhibit 5: Written Counseling Statement dated November 7, 2010.

146.   Col. Nell drafted the written counseling document on November 7, 2010, and left it with the battalion XO so he could personally provide the hardcopy to Major Zeruto for signature since they would both be present at the unit during the week following battle assembly.  (Col. Nell would not be at the unit during this time.)  Exhibit 3(u).

147.   Major Zeruto, being fully aware of Col. Nell's intent, deliberately did not inform him that she would be absent at the assembly. Exhibit 3(u).

148.   Col. Nell, upon being informed of Major Zeruto's unexpected absence, then emailed Major Zeruto the written counseling document later in the day on November 7, 2010, specifically stating that she was to review it, show her intent to comply with the plan of action, sign it, and return it to him via email by November 15, 2010. Exhibit 3(u).

149.    Due to Major Zeruto's long and unexpected leave, as well as her long standing pattern of chronic unresponsiveness, Major Zeruto only signed the written counseling document on February 16 of 2011. Exhibit 3(u); Exhibit 1(h); Exhibit 1(j).

150.    Major Zeruto was specifically made aware that the counseling had been repeatedly sent to her in an email communication from Col. Nell on February 17, 2011. Exhibit 3(u).

151.    This deliberately delayed signing by Major Zeruto was later used as the basis for the DAIG's incorrect findings that this counselling document had been backdated to November 7, 2010. Exhibit 6 at 29.

152.    Though finally signed by Major Zeruto in February of 2011, the written counseling statement was produced within 30 days of Major Zeruto's actions towards the battalion human resources sergeant, and Major Zeruto's delayed signature was only due to her deliberate attempts to avoid having to sign it in person, via skipping without prior notice the November 7, 2010, battle assembly, or via email, by ignoring the email sent to her by Col. Nell that same day. Exhibit 3(u).

**Major Zeruto fails to confirm the delivery of a critical intelligence product the 323rd was tasked by the 66th MI Brigade with producing.**

153.    One of the major priorities issued by the 66th MI Brigade to the 323rd, as part of a program of healing the fractured working relationship between the two, was the production and delivery of a country study by the 323rd. Exhibit 1(l)

154.    This was the primary intelligence product for the battalion ACE and a major priority for Major Zeruto.

155.    Despite the importance of this task, Major Zeruto failed to assume end-to-end ownership of the project by taking the proper steps to confirm that it was properly submitted by the 323rd and received by the 66th. Exhibit 1(l)

156.    Her chronic unresponsiveness throughout her unexpected leave from November 2010 to February 2011 meant that the 66th MI Brigade was only able to confirm the receipt of this critical task when the country study was resubmitted by the 323rd in February of 2011. Exhibit 1(l).

157.    This placed at risk a critical confidence building measure between the 323rd and its commanding unit.

**Major Zeruto receives a not fully-favorable second OER and makes her third and fourth protected communication.**

158.    As a result of Major Zeruto's repeated problematic behavior, as detailed above, Col. Nell drafted her second OER, for the period between March 20, 2010, and September 30, 2010, including the performance of the first field problem (which was not included in the first OER since the rater comments had been written in January 2010) and other subsequent performance that were not fully favorable.

159.    This OER was received by Major Zeruto on February 16, 2011.

160.    As illustrated by his frequent use of verbal and email counseling, Col. Nell had a general practice of avoiding formal written letters of counseling for his subordinates.

161.    This was because Col. Nell believed that verbal counseling was more effective in communicating counseling, and also because written counseling is seen as a prelude to adverse action; due to this, written counseling can often shut down initiative and cause a unit to become risk averse, two things that Col. Nell wished to avoid.

162.    In his second year in command, Col. Nell would, at the suggestion of the battalion executive officer, adopt a policy of issuing in writing both positive and negative counseling in regards to readiness metrics in order to have a statistical record.

163.    Major Zeruto also signed the written counseling dated November 7, 2010, on February 16, 2011, after significant attempts to avoid having to do so, as previously documented.

164.    After receipt of her less than favorable OER and signing her written counseling form on February 22, 2011, Major Zeruto made her third and fourth protected comments, one to the MIRC IG alleging whistleblower reprisal through an adverse OER and one to the MIRC CG requesting a commander's inquiry into perceived discrepancies contained in the OER. Exhibit 6 at 7.

165.    The third protected comment, which formed part of the DAIG reprisal investigation, will be discussed below; the fourth requesting a Commander's inquiry, resulted in a finding by the MIRC Deputy Commanding General ("DCG") that the unfavorable OER was unwarranted and unjust due to Col. Nell's failure to engage in formal written counseling.

166.    This was incorrectly reported by the DAIG as a finding by the MIRC Staff Judge Advocate (SJA), Major Nievra. Exhibit 6 at 9.

167.    The SJA took Col. Nell's sworn statement on the matter and fully appreciated the circumstances behind the less than favorable OER.

168.    However, it was the DCG of the MIRC who wrote the findings memorandum, holding that the less than favorable OER was wrongful because it should have been established

through prior written counseling; the memorandum was dated by the DCG on the last day of Col. Nell's battalion command tenure.

169.    Normally such a memorandum should have been drafted by the SJA and signed by the Commanding General of the MIRC.

170.    Neither the SJA nor the Commanding General of the MIRC were aware of the memorandum drafted by the MIRC's DCG, as evidenced by the fact that the CG made no reference to it in his evaluation of Col. Nell for that rating period.

171.    This finding, containing only the views of the MIRC DCG, was then incorrectly recorded by the DAIG in DIH 11-6066 as a finding by the MIRC's SJA. Exhibit 6 at 9.

172.    Not only did the DCG make his findings outside of the usual channels, and without the usual strong consultation with the SJA, his holding was also contrary to Army Regulation 600-20 ¶2-3 (2008), which leaves the issuing and form of counseling to the discretion of commanders, and Field Manual 6-22 at B-4 (2006) which explicitly encourages flexibility and tailoring of counseling. Exhibit 9: AR 600-20 (2008); Exhibit 10: FM 6-22 (2006).

173.    As noted above, Col. Nell exercised this discretion by preferring to avoid written counseling, in order to avoid harming unit initiative and to ensure maximum effectiveness.

174.    In addition, it was also despite the fact that Major Zeruto herself issued a very negative NCOER to NCOIC Green despite never issuing written counseling and having previously given very positive verbal counseling to NCOIC Green. Exhibit 1(h); Exhibit 1(j).

**Major Zeruto fails to complete the OERs for several of her subordinates, causing major risks for their future career prospects; she is reassigned to battalion special projects officer following the end of her two-year command tenure of Alpha Company.**

175.    Throughout her tenure in command of Alpha Company, Major Zeruto had failed to complete the officer evaluations for four of her lieutenants, which left permanent gaps in their records, threatening their future career prospects. Exhibit 3(v); Exhibit 11: MFR of Lt. Ashely Coates dated March 20, 2011.

176.    Col. Nell asked the battalion human resources personnel, Lt. Ashley Coates and SFC Velez, to document these missing OERs for use in the counselling session for Major Zeruto on March 20, 2011. Exhibit 3(v); Exhibit 11.

177.    Command positions in the Army are limited to two years, and Major Zeruto took command of Alpha company on March 19, 2009, meaning that her tenure ended on March 20, 2020.

178.    This was because Major Zeruto had 19 months of service and 5 months on leave, meaning that she had received an equivalent amount of time in her position as her peers.

179.    Although the ACE chief position was not time limited, as detailed above, the position was dual hatted with command of Alpha Company due to the ACE being composed entirely of Alpha Company personnel and Col. Nell's wish to ensure unity of administrative and mission responsibilities associated with command of Alpha Company as endorsed by Lt. Gen. Daniels.

180.    In addition, promotion tracks generally interval non-key developmental broadening assignments in between key developmental command assignments Due to both her hostile command style and lack of attentiveness to routine administrative matters, but clear competence in the work she personally valued, Col. Nell believed Major Zeruto was best suited .

181.    This can be seen in Col. Nell's own position history, which similarly shows an interspersing of command, and then staff, positions. Exhibit 16: Officer Record Brief of Col. Karl E. Nell.

182.    Reassignment to Battalion Special Projects Officer (SPO) following the end of her command tenure of Alpha Company and the Battalion ACE was thus an ordinary career progression for Major Zeruto, as she would be reporting directly to Col. Nell and handling a large portfolio of major projects.

183.    The most important of these projects was the planning, coordination, resourcing and installation of the Distributed Common Ground Station- Army (DCGS-A) into the 323rd's sensitive compartmented information facility at Dekalb, a major project originally assigned to the battalion executive officer. Exhibit 3(m).

184.    The DCGS-A is the information technology environment within which is integrated the common battlefield operating picture allowing processing, exploitation, and dissemination of intelligence data to be performed, and it is therefore the primary tool of the military intelligence soldier.  Alpha Company personnel were non-mission capable without a significant amount of training on it.

185.    However, the DCGS-A is normally locked up when not on deployment, due to a lack of properly secured facilities.

186.    The 323rd would be able to avoid this because the DCGS-A was to be installed into its sensitive compartmented information facility, which would allow its personnel to use the DCGS-A while on duty at the unit as opposed to only when deployed.

187.    Installation of the DCGS-A would thus give the 323rd a critical home station training capability which most other reserve military intelligence battalions lacked.

188.    Major Zeruto was chosen for this project because of her familiarity with the equipment, following her command of the battalion ACE, and her significant experience with project management; the latter was particularly crucial as the project would take many months, require surmounting significant procedural and security hurdles, and involve frequent coordination with external mission partners requiring field grade seniority (i.e., a Major).

189.    The secondary SPO responsibility of Major Zeruto was to develop strategic communications and motivational products designed to enhance unit cohesion and morale while simultaneously addressing her previous difficulties working with junior personnel, as outlined previously.

190.    Finally, Major Zeruto was also explicitly encouraged to find other projects to help develop her SPO portfolio of responsibilities in a manner of her choosing. Exhibit 12: March 20, 2011, Counseling Statement upon Reassignment to Battalion SPO.

191.    In short, Battalion SPO was a well-suited developmental broadening position for Major Zeruto, as it both directly built on her strengths through major projects, helped her address her previous difficulties with junior personnel, and avoided involvement in field problems while remaining central to the battalion ACE intelligence mission.

**Major Zeruto makes her fifth protected comment, a second whistleblower retaliation claim.**

192.    Three days after being reassigned to battalion SPO, Major Zeruto made her fifth protected comment, a complaint alleging reprisal due her reassignment from battalion ACE chief to battalion SPO; this resulted in the second finding by the DAIG of whistleblower reprisal in DIH 11-6066, which will be discussed below.

**Major Zeruto makes her sixth protected comment, an equal opportunity complaint alleging discrimination based on gender; the complaint is investigated and found to be unsubstantiated, but Col. Nell specifically requests that no inquiry occur as to whether or not the complaint was spurious.**

193.    On March 29, 2011, Major Zeruto made her sixth and final protected comment, an equal opportunity complaint to the MIRC EO alleging that Col. Nell had engaged in gender discrimination by treating her differently from the male officers in the battalion. Exhibit 6 at 7.

194.    An investigation was initiated into this complaint by Col. Larry Cruz, the Group Commander within the MIRC to who the 323rd and half of the other MIRC battalions reported, with the findings of the EO investigation being that the complaints were completely unfounded. Exhibit 1(a).

195.    This was in line with previous investigations (initiated by the first and second protected communications), which had also found that Col. Nell had not previously acted improperly either, accepting one that resulted in verbal counseling concerning language use for Col. Nell and guidance for Col. Nell and Major Zeruto to improve their working relationship. Exhibit 1(a); Exhibit 6 at 9-10.

196.    Col. Cruz specifically asked Col. Nell whether he believed this EO complaint was spurious, which would have resulted in potential UCMJ punishment for Major Zeruto. Exhibit 1(a).

197.    Despite Col. Nell specifically stating that further inquiry was potentially warranted, he followed by stating that he did not believe it was in the interest of the 323rd for it to occur. Exhibit 1(a).

**The Department of the Army Inspector General investigates Major Zeruto's two whistleblower reprisal allegations and finds them to be substantiated.**

198.    10 U.S.C. § 1034 and DOD Directive 7050.06 ban the taking of unfavorable personnel actions (UPAs) as reprisal for the making of protected communications.

199.    The DAIG investigated Major Zeruto's two claims of reprisal, through both the less than fully favorable OER and the reassignment to battalion SPO, and found them to be substantiated.

200.    For the ease of readability, the investigation's findings, in report DIH 11-6066, will be addressed in detail in the argument section.

201.    The investigation was based on one complainant interview (Major Zeruto), twelve witness interviews, and two suspect interviews. Exhibit 6 at 13.

202.    Of those fifteen interviews, the DAIG reported that only two people, including Major Zeruto, attested to a belief that Col. Nell had engaged in reprisal against Major Zeruto. Exhibit 6 at 12-24.

203.    In several of the interviews, the interviewees actually directly supported Col. Nell's actions towards Major Zeruto, but the DAIG never cited or addressed any of these comments in their analysis, which calls into question the strength of their report.

**Colonel Nell assembles a substantial amount of unconsidered evidence and submits an appeal to the DODIG.**

204.    Col. Nell assembled a large file of evidence not considered by the DAIG when it made its findings that the retaliation allegations were substantiated.

205.   This included a chronological map of the evidence, and substantial analysis and rebuttal of the IG findings.

206.   In addition, it also included over twelve fully deliberated memoranda for record from the following commissioned and noncommissioned officers, each attesting to Col. Nell's innocence in regard to the reprisal allegations and substantiating significant additional evidence not considered by the DAIG:

   a.   Col. Larry M. Cruz, the group commander for, among other battalions, the 323rd;

   b.   Lt. Col. Doyle E. Mullis, the investigating officer for the Equal Opportunity complaint against Col. Nell and a civilian Department of Defense Department of the Investigator General investigator;

   c.   Lt. Col. Rudolph Malone, the successor to Col. Nell in command of the 323rd;

   d.   Major Robert Carter, chaplain of the 323rd;

   e.   Major David Kogon, Headquarters and Headquarters Company Commander for the 323rd;

   f.   Lieutenant Alvaro De La Iglesia, former Alpha Company Executive Officer and a party who had previously written an MFR for the improper language complaint against Col. Nell in 2010;

   g.   Chief Warrant Officer Two Rickey Sturdivant, all source intel officer for the battalion and the officer who had inherited the responsibility for Alpha Company field problem 3;

   h.   Chief Warrant Officer Two Allene Pemberton, primary staff officer for intelligence and security for the 323rd and the full time staff member for Alpha Company;

   i.   Mr. [and Sergeant First Class (SFC)] Jared Chichester, former staff operations and training specialist for the 323rd;

   j.   SFC James Green, Alpha Company noncommissioned officer in charge of operations;

   k.   Lieutenant General (Colonel at the time) Jody Daniels, the former brigade commander over all eleven MIRC battalions (including the 323rd); and

   l.   Command Sergeant Major (CSM) Eric Garrison, the most senior enlisted member of the 323rd.

207.    Collectively, these MFR's encompassed the entirety of the full-time staff of Alpha Company, as well as a substantial portion of the top-level staff of the 323rd, including the battalion CSM and Chaplain as well as significant members in the chain of command who were senior to Col. Nell.

208.    All twelve MFRs declared the attestor's belief that either Col. Nell would not reprise against Major Zeruto, or their belief that he did not, almost all stated their belief that the investigation's findings were unsubstantiated, and all recommended reopening the investigation.

209.    He submitted this body of evidence alongside an appeal to the DoDIG of the findings in DIH 11-6066, submitted December 1, 2013 and denied by DoDIG on May 19, 2014.

210.    The DoDIG summarily denied his appeal without any detailing any consideration of the substantial additional evidence submitted. Exhibit 13: 2014 DoDIG Appeal Decision.

**Col. Nell's subsequent promotion history and the negative impact of DIH 11-6066.**

211.    As a result of DIH 11-6066, then Lieutenant Col. Nell was removed by the Secretary of the Army from the Army Promotion List for Fiscal Year 2012 on May 8, 2014. Exhibit 14: 2014 Promotion Review Board determination; Exhibit 15: 2014 Command Review Board Memorandum.

212.    This was despite a strong recommendation by the Army Promotion Review Board in a memorandum dated January 27, 2014, to the Secretary of the Army that he be promoted despite the allegations, as well as glowing OERs and letters of recommendation. Exhibit 14 at 4-5, 8; Exhibit 18; Exhibit 28.

213.    These letters included a letter of endorsement from Major General James Young, the commander of the MIRC at the time of Major Zeruto's allegations and later the Chief of Staff of the U.S. Army Reserve.  Exhibit 18(b): Letter of Recommendation of Major General James Young.

214.    Col. Nell also received letters of endorsement from Major General Leslie Purser (ret.), the Assistant Deputy Chief of Staff of the Army, Major General David Puster (ret.), the deputy commanding general of the US 8th Army, Lt. Gen. Jody J. Daniels, Chief of the U.S. Army Reserve, Brigadier General Peter Quinn (ret.), commanding general of the 84th Training Command, Brigadier General Gabriel Troiano, former commanding general of the MIRC, Col. Robert Appleby (ret.), commander of the Army Reserve Counter-Terrorism Unit at the State Department, and Col. Larry Cruz (ret.), commander of the 208th Regional Support Group, MIRC. Exhibit 18: Letters of Recommendation.

215.    In addition, in 2016 the then Secretary of the Army, Erik Fanning, directed that he be retained on the promotion list for potential promotion to Colonel. Exhibit 18(f).

216.    Despite DIH 11-6066 finding's hampering his career, Lt. Col. Nell was eventually promoted to full colonel, and his promotion was subsequently backdated 4-years by the ABCMR to 2012, when it would have otherwise occurred, in recognition of the questionable nature of DIH 11-6066's findings, as will be discussed below; however, this did not remedy the lost opportunities for colonel command and other more senior positions presently unavailable to him.

217.    This required no less than five applications to the command review board or promotion review board, the final application to the PRB resulting, in combination with the ABCMR's 2016 decision, in his promotion to Colonel/O-6.

218.    Yet DIH 11-6066 continues to hurt his career.

219.    In an attached affidavit, Col. Nell has attested to the fact that he has substantiated knowledge or belief that he is currently on the FY2020 Order of Merit List for nomination for promotion to Brigadier General. Exhibit 17: Affidavit of Col. Karl E. Nell in Support of his Complaint.

220.    Appearance on the FY2020 Brigadier General order of merit list ("OML") makes an officer immediately eligible for nomination to the Senate for eventual promotion to O-7 based upon the needs of the Army at any time prior to the supersession of the personnel on the current list by a new group of selected officers (which in the case of the FY20 list is expected in January 2022 with the FY2022 list of selected officers). Exhibit 17.

221.    Presence on one OML precludes selection by a subsequent GOVPB/GOAAB, creating a fixed window of opportunity for promotion.  Exhibit 17.

222.    Substantiated IG allegations of whistleblower reprisal effectively preclude nomination to the Senate for promotion confirmation to Brigadier General.

223.    Col. Nell is facing "up or out" mandatory retirement on June 1, 2022, and will be among the personnel superseded in the early months of 2022 by the new officers selected for the OML as it would stand in FY2022; if he is not promoted, or retained on the OML, then he will be forced out of the Army. Exhibit 17.

**Col. Nell files multiple applications to the ABCMR.**

224.    On February 17, 2015, Col. Nell filed his first ABCMR application, AR20150003964, seeking:

    a.  Repeal and expungement of the wrongfully found two counts of substantiated reprisal;

b.   Reinstatement to the FY 2012 Colonel APL USAR Board promotion selection list;

c.   Promotion to Colonel with an effective date of April 1, 2013;

d.   Reinstatement to the CY2014 Colonel Command Assignment Selection Board selection list, or current list, with equivalent order of merit;

which were denied on June 12, 2015. Exhibit 19: AR20150003964.

225.   As part of his first ABCMR, Col. Nell included a large set of emails, which he had not yet put together when he filed his initial DoDIG appeal.

226.   Col. Nell filed a second ABCMR application, AR 20160002635 on February 4, 2016, again seeking expungement of the wrongfully substantiated findings in DIH 11-6066, which was denied August 3rd, 2016. Exhibit 20: AR20160002635.

227.   The ABCMR in AR20160002635 mischaracterized the advisory opinion it had sought from the Army Human Resources Command, stating that it recommended disapproval of Plaintiff's request. Exhibit 20 at 7.

228.   In fact, the AHRC advisory opinion appeared to support the Plaintiff's request, stating that the ARHC did not have the authority on its own to set aside whistleblower reprisal findings, but also stating that, should Plaintiff be subsequently promoted, he should file an appeal with the Army Review Boards Agency for correction of his promotion date to Fiscal Year 2012, when he would have been promoted had it not been for the whistleblower findings. Exhibit 21: 2016 ARHC Advisory Opinion.

229.   This is a clear statement of ARHC's support for Plaintiff's case, as they would not suggest that his promotion be backdated unless they believed that the whistleblower findings were wrongful. Exhibit 21.

230.   Col. Nell filed his third ABCMR application, AR20170003673, seeking additional scrutiny into the previous two ABCMR applications, which this time resulted in a full grant of relief. Exhibit 22: AR20170003673.

231.   The ABCMR ordered that his date of rank for his promotion to colonel be changed to reflect what he would have received had he been chosen by the Fiscal Year 2012 promotion board and expressed its concerns that the substantial evidence submitted by Col. Nell called into question the IG's findings in 11-6066. Exhibit 22 at 8.

232.   The ABCMR also ordered that DoDIG conduct a review into DIH 11-6066 with a full consideration of the additional evidence submitted by Col. Nell.

233.    In a memorandum dated September 13, 2017, the DAIG reported to the ABCMR that it stood by its investigation; this memorandum will be discussed in greater detail below for ease of clarity. Exhibit 23: 2017 DAIG Reinvestigation.

234.    Col. Nell appealed this reinvestigation in AR 20180001145, which was denied by the ABCMR on the grounds that the Board was not an investigative body and that, upon review of the DAIG's investigation and reinvestigation, there did not appear to be error or injustice in his case. Exhibit 24: AR20180001145

235.    This was despite the board being asked to consider the record placed in front of it, something well within its capabilities and authority, not to conduct investigatory actions themselves.

236.    Col. Nell's fifth application, AR20190001159 was denied by the Board on the new grounds that it lacked the statutory authority to expunge substantiated investigator general findings of whistleblower retaliation under the amendments to 10 U.S.C. § 1034 effected by the FY2017 National Defense Authorization Act. Exhibit 25: AR20190001159.

237.    This finding was based on the Congressional Conference Committee's notes as to the portions of the bill which modified 10 U.S.C. § 1034, despite the bill not touching the Board's authority under 10 U.S.C. § 1552 and the notes being nonbinding legislative history.

## ARGUMENT

### Claims for Relief 1 and 2
### Administrative Procedure Act, 5 U.S.C. § 706

The ABCMR's decision AR20190001159, holding that it lacks the statutory authority to expunge Inspector General findings as to whistleblower reprisal, should be set aside as contrary to law. The ABCMR's decision AR20180001145 should be set aside as unsupported by the record and arbitrary and capricious.

**Claim 1:   The ABCMR's decision in AR20190001159, holding that it lacked the statutory authority to expunge Inspector General findings, is directly contradictory to the text of 10 U.S.C. § 1552(a)(1) and should be set aside as not in accordance with the law.**

238.    The Administrative Procedure Act, 5 U.S.C. § 706, permits the reviewing court to hold unlawful and set aside agency findings found to be not in accordance with the law.

239.    The ABCMR's decision in AR20190001159, dated October 7, 2019, was a final agency action.

240.    In that decision, the ABCMR held that it lacked the authority to expunge DAIG findings in whistleblower reprisal investigations. Exhibit 25.

241.    This holding was based purely on the ABCMR's interpretation of the Congressional Conference Report on the 2017 NDAA for the portion of the bill, Public Law 114–328, December 23, 2016, § 532, which modified 10 U.S.C. § 1034, the statute governing the prohibition of retaliation against whistleblowers.

242.    The Conference Report stated that the intention of the amendments was to "clarify that when the secretary of a military department concerned receives a report from an inspector general that substantiates that a prohibited personnel action occurred, the secretary may consider whether to take corrective action, but may not make a determination in such cases that a prohibited personnel action did not occur." Exhibit 26: H. Rept. No. 114-840 at 60 (2016) (Conf. Rep.)

243.    This decision by the ABCMR to deny Col. Nell's request for review and expungement of this IG report through solely relying on the Conference Report was not in accordance with the law.

244.    First, the authority of a secretary of one of the military departments to, through civilian boards, correct military records is governed by 10 U.S.C. § 1552, not 10 U.S.C. § 1034, the statute changed by § 532 of the 2017 NDAA. PL 114-328 at § 532.

245.    10 U.S.C. § 1552 was not changed in any way by the 2017 NDAA.

246.    There is no legislative history to suggest that the 2017 NDAA, or any NDAA since, *intended* to modify 10 U.S.C. § 1552.

247.    10 U.S.C. § 1552(a)(1) continues to state that "The Secretary of a military department may correct *any* military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." (Emphasis added).

248.    Thus, the ABCMR's decision is clearly contradicted by the plain meaning of 10 U.S.C. § 1552(a)(1).

249.    Nonbinding legislative history, such as the Conference Committee Report cited as the basis of the ABCMR and Secretary's decisions, cannot override the plain meaning of a statute. *See Music Choice v. Copyright Royalty Board*, 970 F.3d 418, 426 fn.7 (D.C. Cir., 2020).

250.    Even if we are to consider the legislative history, the ABCMR's decision remains legally incorrect in its assessment of the impact of the 2017 NDAA on 10 U.S.C. § 1034.

251.   What the 2017 NDAA did was to change the rights of the Secretaries of military departments to set aside substantiated Inspector General findings before any action was taken on them. PL 114-328 § 532.

252.   As modified, 10 U.S.C. § 1034(f)(1) was changed from permitting a Secretary to completely set aside an Inspector General finding which had not yet been acted on, to only permitting the Secretary to determine whether corrective or disciplinary action should be taken.

253.   10 U.S.C. § 1034(f) was also changed at (f)(3) to require the Secretary, should they decide that no corrective or disciplinary action should be taken, to provide the Secretary of Defense and, the member or former member who filed the whistleblower retaliation complaint, notice of their decision and the reasons for not taking action.

254.   In sum, the legislative intent behind § 532 of the 2017 NDAA was to prevent substantiated Inspector General findings from being quietly killed by the Secretary of a military department.

255.   There is no evidence that Congress intended to render Inspector General reports on whistleblower retaliation completely unreviewable or uncorrectable after they had been acted upon.

256.   This is exemplified by the fact that Congress took no action to modify 10 U.S.C. § 1552.

257.   Had Congress wished to remove the power of BCMR's to expunge whistleblower retaliation reports from the records of the alleged perpetrator, it would have done so.

258.   The decision of the ABCMR can thus only be possibly justified through the doctrine of *in pari materia*, as the ABCMR is reading the 2017 NDAA's changes to 10 U.S.C. § 1034 as impacting 10 U.S.C. § 1552.

259.   The doctrine of *in pari materia* states that adjacent statutory subsections that refer to the same subject matter should be read harmoniously. *United States v. Mills*, 850 F.3d 693, 698-9 (4th Cir. 2016).

260.   This would require showing that the purposes behind 10 U.S.C. § 1034 and 10 U.S.C. § 1552 are identical. *United States v. Broncheau*, 645 F.3d 676, 685 (4th Cir. 2011).

261.   This cannot be shown here, as the two statutes have clearly different purposes (the punishment of whistleblower retaliation and the correction of military records), even if they both superficially relate to the similar subject of military records.

262.   When identical purposes are not shown, *in pari materia* has no force. *United States v. Broncheau*, 645 F.3d at 685.

263.   This means that the plain meaning of 10 U.S.C. § 1552(a)(1), granting the authority of the Secretaries of military departments to correct *all* records, remains firmly in force and is unaffected by 10 U.S.C. § 1034(f).

264.   Even if *in pari materia* were to be in force, a harmonious reading of 10 U.S.C. § 1034(f), as colored by the legislative history, and 10 U.S.C. § 1552(a)(1) would be to hold that § 1034(f) removes the ability of the Secretary to set aside an inspector general whistleblower retaliation finding without acting on it while not removing the ability of a BCMR to correct such a finding after the fact, on application by the alleged perpetrator.

265.   In short, there are no circumstances in which the ABCMR and Secretary for the Army's decision holding that they cannot expunge the Inspector General report is legally correct:

1-   The plain meaning of 10 U.S.C. § 1552(a)(1) cannot be overridden by the legislative history of amendments to an unrelated statute;

2-   The doctrine of *in pari materia* does not apply;

3-   Even if it did, a harmonious reading of the two statutes would still require allowing the BCMR to review and expunge Inspector General reports after the reports have been originally acted upon.

266.   Thus, the ABCMR's decision that it could not expunge the Inspector General reports should be set aside as not in accordance with the law.

**Claim 2:   The ABCMR's decision in AR20180001145, upholding the DAIG's review of DIH 11-6066, should be set aside as arbitrary and capricious. However, for the purposes of judicial economy, the ABCMR should be given one last opportunity to reconsider its decision.**

267.   As established above, the ABCMR has the statutory authority under 10 U.S.C. § 1552 to expunge DAIG findings of whistleblower reprisal.

268.   The ABCMR's decision in AR 20180001145, where it upheld the DAIG's cursory review of DIH 11-6066, a report which the ABCMR had previously shown major concerns about in AR20170003673, was arbitrary and capricious and should be set aside.

269.   10 U.S.C. § 1034(b)(1) bans the taking, or threatening, of unfavorable personnel actions ("UPA") as a reprisal against a member of the armed forces *for* making or preparing a protected communication.

270.   In order for a whistleblower reprisal finding to be substantiated, the investigator must thus find that there was, on the preponderance of the evidence, a direct causal link between the UPA and the making of the protected communication.

271.   On the basis of the evidence reviewed by the DAIG when making their reassessment of DIH 11-6066, including both the original investigation record and Col. Nell's submitted evidence, the record clearly does not support a finding that there is a preponderance of the evidence for such a causal link.

272.   In addition, the argument given by the DoDIG for its upholding of its investigation is based on several mistakes of fact.

**The IG's findings in the investigation of the alleged reprisal through an unfavorable OER were not supported by a preponderance of the evidence.**

273.   DIH 11-6066 based its holding that Col. Nell had retaliated against Major Zeruto, through an allegedly inappropriate and unwarranted unfavorable second OER, on their finding that his unfavorable OER was unreasonable on these grounds:

   a.   The field problems were improperly included in his assessment of Major Zeruto because they were outside the rating period of March 20, 2010, through September 30, 2010.

   b.   Heavily weighting Alpha company's failure during the exercises in his assessment of Major Zeruto was unwarranted because:

      i.   Personnel believed that Col. Nell had set unrealistic training goals;

      ii.   The failure of the first exercise was not the fault of Alpha Company personnel; and

      iii.   The third exercise was well executed and even featured in the MIRC magazine.

   c.   Col. Nell both failed to show that Major Zeruto lacked the will to execute his orders and failed to show when this lack of will began.

   d.   Major Zeruto was not responsible for Alpha Company's failure to provide sufficient billets for Austere Challenge, as this was instead the responsibility of each company's first sergeant.

   e.   Major Zeruto's failure to perform the rebasing study was justified because the MIRC G-5 indicated that the study was not appropriate for a company commander.

f.  The administrative problems in Alpha Company were not Major Zeruto's fault due to:

   i.  Major Zeruto's health problems due to complications from her pregnancy;

   ii.  There were mitigating factors to her administrational struggles, such as inheriting a substantial backlog of late OERs requiring company action; and

   iii.  Alpha Company was the biggest company in the battalion and the administrative and operational challenges would be difficult for any competent officer to resolve.

g.  Col. Nell's comments were inconsistent with the positive OERs he gave to other officers within the battalion who showed the same behavior as Major Zeruto, such as verbally resisting his initiatives.

h.  The comments were procedurally flawed because they were unaccompanied by sufficient written counseling performed during the rating period itself, as suggested by FM 6-22, Chapter 8, concerning non-punitive actions.

Exhibit 6 at 24-28.

## A.  Major Zeruto's poor performance in preparing for the field problems was properly included in her OER as it fell within the rating period.

274.  The IG found that the Alpha Company's poor performance during the field exercises were outside of the review period of March 20 through September 30, 2010, for Col. Nell's less-than-favorable OER for Major Zeruto.

275.  When Col. Nell wrote his comments for Major Zeruto's first OER, it was before the extension of the review period of the first OER from prior to the first field problem to after the field problem, thanks to the delays by the senior rater.

276.  This meant that Col. Nell properly included Major Zeruto's failures during the first field problem in his second OER, because this was the first time he was writing his comments for her after it had taken place and could be taken into account in his assessment of her performance.

277.  Execution of the second field problem on July 24-25, 2010, as well as Major Zeruto's complete lack of prior preparation for this field problem, also fell entirely within the rating period.

278.  Major Zeruto's failure to prepare for the third field problem was properly included in her OER because her failure occurred entirely within the rating period, as responsibility for the

third field problem was shifted to CW2 Sturdivant and Major Ohlmann on August 21, 2010, due to her having completed no work on it up until that time (or afterward).

**B.    Alpha Company's struggles during the field exercises were reasonably heavily weighted in Col. Nell's negative OER for Major Zeruto.**

279.    Alpha Company's failures during the field exercises were reasonably the basis for Col. Nell's less-than-favorable OER for Major Zeruto because the training goals were reasonable, the failure to perform in the first exercise was the fault of a complete failure by Alpha Company leadership, and the third exercise was a success in spite of Major Zeruto's complete lack of effort, not because of her performance.

280.    The training goals set out for Alpha Company were reasonable, as evidenced by the fact that not only it succeeded in its third field problem, but both Bravo and Charlie company mostly succeeded in their first field exercise, and completely succeeded in their second and third. Exhibit 4(b).

281.    Col. Nell's commanding officer, Lieutenant General Daniels, approved and supported Col. Nell's training plan for the 323rd. Exhibit 1(k).

282.    Although only a Colonel at the time of these events, Lt. Gen Daniels is now the Chief of the Army Reserve and Commander of U.S. Army Reserve Command – responsible every Reserve soldier.  As the highest-ranking military intelligence officer in the Army Reserve and co-equal to the highest-ranking military intelligence officer on active-duty in Army, her professional judgment in this matter should be considered definitive.  Exhibit 1(k).

283.    Despite Col. Nell inheriting a clearly struggling battalion, Headquarters, Bravo, and Charlie companies all still managed to substantially succeed in their first field problems, dated March 20 to 21, 2010 (Bravo Company) and October 17 to 18, 2009 (Headquarters and Charlie Companies). Exhibit 4(b).

284.    In addition, Headquarters, Bravo, and Charlie companies completely succeeded in their second and third field problems, dated March 20 to 21, 2010 (Charlie problem 2), June 19 to 20, 2010 (Headquarters problem 2), August 21 to 22, 2010 (Bravo problem 2, Headquarters and Charlie problem 3) and October 16 to 17, 2010 (Bravo problem 3). Exhibit 4(b).

285.    This shows that Col. Nell's training plan was not only reasonable but succeeding.

286.    The belief among some members of battalion personnel in the unreasonableness of the training plan is a product of the well-noted bad climate of the deeply underperforming battalion that Col. Nell inherited and completely turned around. Exhibit 1(k); Exhibit 1(d).

287.    Alpha Company, by contrast, completely failed in its field problem, a performance described by CSM Garrison as "the worst meltdown of company leadership I have observed in a long time." Exhibit 1(l).

288.    This failure was the fault of Alpha Company and its leadership, given that both CSM Garrison and its operations noncommissioned officer in charge, SFC Green, believed that the weather conditions had sufficiently cleared and should not have been used as an excuse to cancel the exercise. Exhibit 1(j); Exhibit 1(l).

289.    Even if the weather had been perfect, the company would have still failed, as they had not been properly prepared for the exercise.

290.    NCOIC Green even goes so far as to blame Major Zeruto for instigating the advance party's inflation of the cold weather risk assessment, in order to ensure that the event, apparently unpopular with Alpha Company personnel was cancelled. Exhibit 1(j).

291.    Alpha Company's performance in the second field problem, though better than in the first, was still worse than Bravo and Charlie companies' performance in their first field problems. Exhibit 4(b).

292.    This was, yet again, due to a lack of prior planning by Major Zeruto, as she left the company without a training scenario. Exhibit 1(g).

293.    Despite this failure, Alpha Company personnel, during discussions with Col. Nell during the second field problem, began to better understand his training goals and what he wanted for their unit. Exhibit 1(f).

294.    This resulted in significantly stronger buy-in from the personnel of Alpha Company, which helped contribute to its complete success in its third field problem.

295.    This success, featured in the MIRC's magazine, was in spite of Major Zeruto's complete failure to engage in any preparation for the event during the time in which it was her responsibility. Exhibit 1(g); Exhibit 1(l).

296.    At the latest, Major Zeruto had nearly six months of advance notice of this field problem to begin preparing for it, as the training calendar had been published on May 1, 2010. Exhibit 1(g).

297.    However, Major Zeruto in fact had a substantially longer period of time, as the calendar had been developed by the company commanders in December of 2009. Exhibit 1(g).

298.     Despite this long period of time in which she could have prepared for the field problem, when CW2 Rickey Sturdivant and Major Ohlmann inherited responsibility for the planning of the event in late August of 2010, nothing had been done to prepare for it. Exhibit 1(g).

299.     Had CW2 Studivant and Major Ohlmann not been given responsibility for the field problem, it is likely that it would have never happened at all, due to Major Zeruto's failure to prepare for it. Exhibit 1(g).

300.     Despite six months of preparation being ideal for the field problem, CW2 Sturdivant and Major Ohlmann still succeeded in a tight time window to prepare the exercise and prepare Alpha Company for it, leading to a resounding success. Exhibit 1(g).

301.     Major Zeruto's track record of complete failure and negligence of her duties during the three field problems, the core of the training plan Col. Nell set out to turn the 323rd from a failing battalion to a top unit in the MIRC, were very reasonably given heavy weight by Col. Nell in his assessment of her performance.

302.     At each step Major Zeruto not only refused to prepare for the exercises, but also attempted to sabotage the program, such as by encouraging the advance team to make a finding that would require the cancellation of the first field problem. Exhibit 1(j).

303.     The second field problem was the first instance during which ACE soldiers returning home from recent deployment to Iraq would rejoin non-deploying Alpha company personnel.

304.      Instead of fostering a constructive atmosphere for this reintegration through accurate company messaging before their return, and preparing an appropriate ACE exercise training scenario, Major Zeruto's inactions undermined Col. Nell's attempt for a seamless reintegration and further damaged unit cohesion – in part resulting in the need for his personal intervention with the company during field problem 2.

305.     Her complete failure to prepare for the third field problem in the substantial time allotted to her would have also resulted in the cancellation of the third field problem. Exhibit 1(g).

306.     Alpha Company's performance only began to match that of Bravo and Charlie Companies once Major Zeruto's responsibility for planning the exercises was transitioned to CW2 Sturdivant and Major Ohlmann.

307.     Contrary to the IG's findings, Alpha Company's success in the third problem was not evidence that her less-than-favorable OER was unreasonable, but instead further evidence of Major Zeruto's poor performance and the strong potential Alpha Company had when not under her influence. *Contra* Exhibit 6 at 26-7.

**C-D.** **Col. Nell submitted more than sufficient evidence that Major Zeruto lacked the will to carry out his orders, evidence that includes Major Zeruto's failure to obtain commitments for Austere Challenge 2011.**

308. The IG in DIH 11-6066 found that Col. Nell had failed to substantiate that Major Zeruto lacked the will to carry out his orders and had also failed to provide a date as to when this began.

309. Given that Major Zeruto failed to perform the very first tasks he assigned to her when she took command, tasks that were *mandatory* for company commanders under US Army Reserve policy, it is clear that she lacked the will to carry out his orders from the start. Exhibit 3(d).

310. The consistent pattern of not only personal resistance, but mobilization of company personnel against his training plans, by Major Zeruto is clear evidence that she lacked the will to carry out his orders. Exhibit 1(j).

311. As illustrated above, not only did she directly sabotage the first field problem, but her lack of preparation would have also meant the cancellation of the third.

312. Major Zeruto repeatedly failed to carry out the tasks he requested, such as the preparation of ceremonies for the personnel within her company who were retiring or transitioning to other posts.

313. The IG found that Major Zeruto was not responsible for the very low level of Alpha Company personnel volunteering for Austere Challenge, the top priority of the 66th MI Brigade for the 323rd, as this was the responsibility of the company first sergeant. Exhibit 4 at 25. This is a spurious argument since the company commander is ultimately responsible for all actions of the company.

314. Yet, when he was acting first sergeant for Alpha Company, NCOIC Green, stated that Major Zeruo never asked him to lead, assist, or even facilitate the completion of this task. Exhibit 1(g).

315. In addition, once Captain Holtz assumed command of Alpha Company when Major Zeruto went on leave, he was able to secure 10 commitments in the space of a month, more than twice the four she had secured over the entirety of TY 2010-2011 when she was in command. Exhibit 1(l); Exhibit 4(a).

316. Personnel within the battalion believed that Major Zeruto was showing a clear lack of will in carrying out Col. Nell's intent for the company. Exhibit 1(h); Exhibit 1(i); Exhibit 1(j); Exhibit 1(l).

317.    The full-time unit staff officer for Alpha Company and battalion S-2r, CW2 Allene Pemberton, had weekly (if not daily) personal observation of Major Zeruto, and compared her observations with the weekly staff meeting notes generated by the Alpha Company unit administrator, Ms. Deshelle Downey. Exhibit 1(h).

318.    She found that both were in agreement that Major Zeruto had a strong reticence to action professional development education (PDE) for company personnel, (i.e., Officer Educational System (OES) and NCOES schooling) as well as other administrative taskings with which she disagreed. Exhibit 1(h).

319.    The battalion Staff Operations and Training Specialist (SOTS), Mr. Chichester, also observed that Major Zeruto lacked the will to implement battalion guidance in annual training priorities, schools enrollment, and other company training commitments which were all within his official purview to monitor as battalion SOTS. Exhibit 1(i).

320.    This was reinforced by the failure of Alpha Company officers and warrant officers to complete required PDE, with 18 unscheduled soldiers as compared to zero for Bravo and zero for Charlie Company. Exhibit 1(i).

321.    Col. Nell himself came to this conclusion as well by October 18, 2010, when he specifically called into question Major Zeruto's willingness to execute his guidance in an email to her. Exhibit 3(p).

322.    Just as with the field exercises, the significantly improved performance of Alpha Company in meeting command goals once Major Zeruto left command to go on leave substantiates this belief in her lack of will to carry out battalion guidance.

**E. Major Zeruto was at fault in the rebasing study because she dropped the project abruptly, instead of informing battalion command of the obstacles faced, which would have allowed for surmounting them.**

323.    The DAIG found that the failure of Major Zeruto to make progress in actioning the rebasing study was not her fault since Major Turpin, the MIRC Plans Officer (G-5) and the former 323rd XO had informed her that the study was not appropriate for a company commander. Exhibit 6 at 25-26.

324.    First and foremost, pushback from former 323rd personnel who were at risk of embarrassment if the long planned, but languishing, rebasing project was completed should not have been evidence for the DAIG that the project was indeed inappropriate for a major.

325.    Second, both Colonel Stewart, then commander of the 66th Military Intelligence Brigade, and Lt. Gen Daniels, then commander of the Theater Support Command within the MIRC – i.e., senior leaders within both the active-duty and reserve chains-of-command – wanted the re-basing study recommendations implemented in order to realize the needed resource

savings and operational benefits that would immediately accrue from the closure of an unnecessary facility.

326. Third, since the study solely concerned a detachment of Alpha Company (i.e., the Staten Island, New York, Detachment) and 100% of the formal staffing of its recommendations – that might in principle have required a more senior action officer – was completed long prior to Major Zeruto's involvement, it would have actually been inappropriate for Col. Nell to assign any officer other than Major Zeruto, as Alpha Company commander, to work with her subordinate Staten Island Detachment commander to re-base their personnel.

327. Fourth, Col. Nell's intent for Major Zeruto in implementing the study recommendations was to re-base, i.e., move to a new location, the Staten Island Detachment personnel and equipment. Vacating the facility would enable the facility owners (e.g., Army Installation Command) vice the leasing organization (i.e., MIRC) to close or re-purpose the buildings concomitantly creating immediate cost savings for the MIRC. Maj Zeruto's responsibility centered on the personnel and equipment organic to Alpha Company – duties that are entirely within the purview and accepted scope of responsibilities of any company commander.

328. Fifth, Col. Nell did not fault Major Zeruto for receiving pushback, what he faulted her for was completely dropping the project on receiving that pushback and failing to inform Col. Nell of the situation or to keep him apprised of the lack of progress.

329. In short, Major Zeruto was not poorly rated for facing challenges, she was poorly rated for immediately dropping a project out of fear that it could possibly be politically damaging to her due to poor optics within her company and with former 323rd personnel who were now higher up in the MIRC, and for failing to bring Col. Nell into the loop in order to help her surmount those challenges. Exhibit 3(p).

**F. Major Zeruto was responsible for the administrative mess of Alpha Company and that mess was not due to the complications from her pregnancy.**

330. Like her peers Major Zeruto inherited a number of late personnel evaluations for company personnel.

331. All companies faced this challenge equally due to the uncertainty following the relief of Col. Nell's predecessor and before Col Nell's selection; however, the other companies quickly brought this situation under control after Col. Nell assumed command.

332. As events developed, Major Zeruto exacerbated this problem by failing to complete additional evaluations as they later become due during her tenure. Exhibit 11.

333. In addition, unlike her company commander peers, Major Zeruto lost her civilian job and requested that Col. Nell bring her on full-time 179-day active-duty orders not long after the

failure of the first field problem; Col. Nell granted this request in the hope that the additional work-days might alleviate Alpha company's problems.

334.    Thus, Major Zeruto had much more time available for planning and operations than the one-weekend-a-month availability of her peers, who all still managed to both successfully complete their planning, operations, and administrative tasks, and yet, not only did she completely fail to engage in planning for the field exercises, as detailed above, she also fell far behind on her administrative tasks.

335.    Major Zeruto's failures to administer her company began long before any complications with her pregnancy emerged.

336.    This included, as has been detailed above, the complete failure to ensure adherence to battalion guidance on ensuring the professional development education of Alpha Company personnel.

337.    This arose to such a decree as to be considered by the fulltime staff officer for Alpha Company, CW2 Allene Pemberton, as evidence of Major Zeruto's "complete disregard for the battalion goals and soldier welfare" and that she was "motivated solely by self-interest." Exhibit 1(h).

338.    Although unreferenced by DAIG, this sentiment was also consistent with that of other Alpha Company full-time personnel, including those interviewed by Lt. Col. Mullis when he investigated Major Zeruto's equal opportunity complaint against Col. Nell. Exhibit 1(b).

339.    While Alpha Company was the largest company in the battalion, Major Zeruto's level of failure and observed lack of effort or interest is completely indefensible, especially given that she had immensely more time to attend to her duties than her peers, who managed to perform the full scope of their duties. Exhibit 1(h); Exhibit 1(i); Exhibit 1(j); Exhibit 1(l).

340.    In addition, Major Zeruto's lack-of-will to execute continued even after she returned from her pregnancy leave, as illustrated by her failure to complete newly overdue OERs for her subordinates. Exhibit 11.

**G. The inconsistency between Major Zeruto's OER and the OERs of other officers in the battalion was reasonable.**

341.    One of the foundations of the IG's finding that Col. Nell had engaged in reprisal against Major Zeruto via a less-than-favorable OER was that her OER was inconsistent with those of others who had engaged in contentious disagreements with Col. Nell. Exhibit 6 at 26.

342.    However, those inconsistencies were reasonable as those parties, though they may have disagreed vehemently with Col. Nell, or even attempted to buck the system at times, still performed their duties at the end. Exhibit 6 at 26; Exhibit 4(b); Exhibit 1(e); Exhibit 1(g).

343.    The 323rd's culture was broken when Col. Nell assumed command, and, forewarned to expect to face substantial resistance, he exhibited a remarkable tolerance for it. Exhibit 1(k); Exhibit 1(d).

344.    Bravo and Charlie Companies shared in this broken culture, even though there was resistance, turned things around and followed the training plans he set out for them. Exhibit 1(e); Exhibit 1(k); Exhibit 1(d).

345.    Bravo and Charlie Companies also endeavored to fill the billets they had agreed to for Austere Challenge, with Bravo Company filling 60% and Charlie Company filling 90% by the fall of 2010. Exhibit 1(l).

346.    Col. Nell's pattern of seeking to take care of all soldiers – even officers who very vocally disagreed with him – was extended to Major Zeruto, as shown by his placement of her as ACE chief in order to help burnish her CV and prepare her for promotion to major.

347.    What distinguished Major Zeruto from the others who vocally disagreed with Col. Nell was that she repeatedly and flagrantly refused to perform the duties he set out for her.

348.    In addition, where other parties went beyond vocal disagreement and began to exhibit poor performance, Col. Nell did engage in non-punitive counseling, but subsequently gave good marks in their OER when that counseling resulted in improvements in performance. *E.g.,* Exhibit 6 at 17.

349.    Only one party other than Major Zeruto failed to improve their performance or change their behavior following Col. Nell's intervention, Battalion Operations Master Sergeant Eugene Holcroft.

350.    Just like Major Zeruto, his NCOER from Col. Nell had similar comments concerning his failure to complete required tasks and he received a 3/3 senior rater assessment (i.e., equivalent to OER center-of-mass).

351.    In short, Col. Nell's consistent pattern of only giving less-than-favorable OER remarks for poor performance *which remained unchanged following intervention* is a more than reasonable basis for the differing treatment of Major Zeruto in her OER as compared to her fellow officers in similar situations.

**H. Col. Nell's practice of engaging in informal counseling was reasonable given his long-standing practice of seeking to improve his subordinates while not damaging either their careers or the unit command climate.**

352.   Both the DAIG report and the MIRC DCG memo highlighted the fact that Col. Nell failed to engage in formal written counseling and argued that he should have done so if he had wished to give Major Zeruto a less-than-favorable OER. Exhibit 6 at 26-7.

353.   This was used as ostensible evidence that Col. Nell's less-than-favorable OER was unreasonable, as he should have been laying the groundwork to substantiate it through formal channels while Major Zeruto's problems were occurring.

354.   It was also used as evidence that the less-than-favorable OER was retaliatory, on the grounds that the negative assessments only emerged after Major Zeruto made the protected comments.

355.   However, Col. Nell did indeed engage in substantial informal counseling with Major Zeruto, always within 30 days of one of her failings being revealed, including, but not limited to:

   a.   Verbal counseling following Alpha Company's failure during the first field.

   b.   Verbal counselling after the first day of Alpha Company's failed second field problem, as evidenced by the official email communication on July 25, 2010, from Major Zeruto to Col. Nell requesting a transfer and his prompt reply clarifying that she was not fired; Major Zeruto's ultimate decision to remain in the unit refutes the possibility of other potential causes for this email (e.g., perceived poor treatment or dissatisfaction with Col. Nell's policies). Exhibit 3(j).

   c.   Email counseling, on March 11, 2010, two weeks after Col. Nell had discovered her failure to complete (or even enroll) in the mandatory Pre-Command Course, as she had been tasked in 2009 when she first took command.  The reasonableness of timing for this verification is demonstrated by typical 6-month centralized delays in assigning students to specific classes.  Exhibit 3(d).

   d.   On September 27, 2010, concerning her poor performance in filling billets for Austere Challenge. Exhibit 3(w).

356.   Army Regulation 600-20 ¶2-3 grants substantial discretion to unit commanders to determine the timing and method of performance counseling, and Field Manual 6-22 specifically encourages flexibility and tailoring counseling to the needs of the subordinate. Exhibit 9.

357.   Col. Nell generally preferred to perform performance counseling either via email or verbally, though he did sign off on written counselling from Major Tluczek following the October 18 incident detailed above.

358.    This is because written counseling, via a formal letter of counseling, enters into a soldier's local Military Personnel Records Jacket and may continue to adversely affect them even after the tenure of the commander ends through routine change-of-command and personnel rotation.

359.    Furthermore, the command climate created by premature written counselling would have proven detrimental to the willing buy-in and personal commitment on the part of each of Col. Nell's subordinate leaders that was needed for the unit reforms implemented by Col. Nell to become permanent and result in a long lasting success.

360.    Despite inheriting the task of reforming a deeply struggling unit with a broken command climate, Col. Nell endeavored to correct his subordinates in a way that would not reflect poorly on them in the long run, while simultaneously maximizing shared buy-in.

361.    This is in line with his consistent pattern of only giving less-than-favorable OERs to the parties who failed to improve following counseling, as detailed above and in DIH 11-6066.

362.    Col. Nell, rather than retaliating against Major Zeruto, in fact often took steps to protect her.

363.    In an email dated October 20, 2010, he specifically requested that Major Tluczek reduce the requirements he had set out for Major Zeruto in her apology email for her behavior during the incident which had spawned the October 18, 2010, counseling described above. Exhibit 3(q).

364.    Even with the track record of Major Zeruto's problematic behavior, Col. Nell still sought to protect her leadership and to help her save face with the unit. Exhibit 3(q).

365.    Further evidence of this practice is Col. Nell's decision not to request further inquiry into Major Zeruto's EO complaint, in order to determine if it was spurious, following the investigator's finding that it was unsubstantiated. Exhibit 1(a).

366.    Despite stating his own belief that further inquiry was potentially warranted, which would have led to punishment for Major Zeruto had the investigator found that her complaint was spurious, he then stated that he did wish for such an inquiry to happen. Exhibit 1(a).

367.    Even after Major Zeruto's continually poor performance, and her attempted uses of the IG system to sabotage Col. Nell and his efforts to reform the 323rd, Col. Nell still refused to engage in likely warranted actions in order to avoid slowing the progress of the 323rd and harming Major Zeruto's career. Exhibit 1(a).

368.   In short, the lack of a track record of formal written counseling is not evidence that Col. Nell lacked complaints about Major Zeruto's performance prior to her protected communications, or that he was not addressing her failings as they happened.

369.   There is instead substantial evidence that these were part of a consistent practice by Col. Nell of protecting the careers of the officers he was trying to improve, even when they gave him ample reason to make comments that would follow them permanently.

370.   The DAIG thus misinterpreted Col. Nell's practices that were designed to protect his subordinates as evidence that he was in fact retaliating against Major Zeruto, despite Major Zeruto being a major beneficiary of those practices.

371.   In short, as has been demonstrated above, at every level of the IG's argument as to why Col. Nell's less-than-favorable OER for Major Zeruto was unreasonable, the preponderance of the evidence supports the position that he was in fact reasonable in his comments and that a less-than-favorable assessment was more than warranted.

**Major Zeruto was reassigned from her duties as ACE chief for just cause.**

372.   DIH 11-6066 found that Col. Nell had retaliated against Major Zeruto by reassigning her without just cause from her duties as ACE chief and shifting her to becoming the Special Projects Officer for the battalion.

373.   It based this finding on these grounds:

a.   His stated reasons for removing Major Zeruto did not correlate with her duties as ACE chief, rather, they correlated with her performance as Alpha Company commander;

b.   The country study cited by Col. Nel and Major Tluczek in the February 15, 2011, counseling of Major Zeruto wasn't submitted late; and

c.   Special Projects Officer was an improper position for Major Zeruto given her experience, rank and background.

Exhibit 6 at 29-30.

374.   The IG did not address the Col. Nell's other reasons for removing Major Zeruto from command, which was her overly hostile style of leadership, Major Zeruto's own complaints that she was being asked to do too many things, and her failure to perform OERs for four of her subordinates, leaving a permanent gap in their records.

**A.    Col. Nell's reasons for reassigning Major Zeruto also correlated with her performance as ACE chief.**

375.     The IG found that the reasons Col. Nell gave for relieving Major Zeruto of her position as ACE chief were correlated with her performance as Alpha company commander, not her performance as ACE chief. Exhibit 6 at 29.

376.     It is important to note that Col. Nell's findings of deficiency in Major Zeruto primarily related to her failure in planning and preparing for intelligence training of the ACE (i.e., Alpha Company intelligence analysts) in a field environment, which was not just limited to her failure to prepare for the administrative or logistical aspects of the three field exercises, but also included her failure to ensure that Alpha Company personnel were performing their required professional military education. (See above).

377.     Following the selection of Captain Holt as Major Zeruto's successor in command of Alpha Company, the positions of ACE chief and Alpha Company commander were re-separated, as Major Ohlmann, the deputy ACE chief, did want command of Alpha Company and to place him under Captain Holt would be detrimental to him.

378.     However, even after the re-separation of the positions, the subsequent officer serving as ACE Chief was still charged with coordinating with Alpha Company in developing training opportunities for the ACE, overseeing the planning, preparation, and execution of ACE field operations, and providing exercise support for Austere Challenge, including filling volunteer billets. Exhibit 1(c).

379.     This was a common set of duties for the ACE Chief and was continued by Col. Nell's successor in command of the battalion, Lt. Col. Malone. Exhibit 1(c).

380.     Major Zeruto's complete failure in regard to training scenario development, intelligence operations planning for Alpha Company personnel, and the preparation and performance of Alpha Company in the field environment  thus also directly spoke to, and correlated with, her abilities to perform the duties of battalion ACE chief.

381.     Col. Nell's removal of Major Zeruto from her position as ACE Chief, and shift to Special Projects Officer, was thus justified by her lack of ability to perform a significant portion of her duties as ACE Chief, independent of her company command functions.

382.     Major Zeruto was retained in her original dual-hatted ACE Chief / Company Commander role for a nineteen-month performance tenure (i.e., March 20, 2009 through September 30, 2010) which, when combined with a five-month medical absence (October 2010 – February 2011), was of a length typical of her peers (i.e., two years).

383.     Since the complainant's two-year command tenure had ended, reassignment to a valid, authorized, and assigned non-key developmental, military intelligence billet was not only appropriate but actually mandatory due to command tenure limitations.

384.    If Colonel Nell intended to purposefully damage the complainant's career in reprisal, he could easily have recommended a "Below Center-of-Mass" evaluation, unilaterally decremented one or both of her OER "Best-Qualified" and "Must-Promote" blocks, or included rater comments stating, "Relieved of Command," as it is well known that any of these actions effectively end a military career. Exhibit 27: 2nd OER for Maj. Zeruto.

385.    None of these actions were taken.

386.    Lt. Col. Malone's reinstatement of Major Zeruto as ACE Chief was not a reflection on the inappropriateness of her removal, rather it was a product of operational necessity due to a lack of available officers in the battalion. Exhibit 1(c).

**B.    Major Zeruto failed to ensure proper delivery of the country study.**

387.    As stated before, when Col. Nell took command of the 323rd, relations with the 66th MI Brigade were severely strained.

388.    A key element of rebuilding the relationship between the 323rd and the 66th MI Brigade was the on-time completion of an Operational Intelligence Support (OIS) country study by the ACE.

389.    As detailed above, Major Zeruto failed to take the steps necessary to ensure that the 66th MI Brigade received the study on time, and her chronic unresponsiveness meant that the 323rd could only confirm submission of the report by resubmitting it two months after the planned deadline.

390.    The IG found that the report was not late, based on witness testimony.

391.    However, the IG missed the essential point: Major Zeruto was not counseled in February 2011 for failing to complete the report on time; rather, she was counseled for her failure to maintain end to end ownership of a task that was critical to the 323rd's mission at the time, as well as her chronic unresponsiveness.

392.    The IG, in a related point, cites as evidence of their finding that Major Zeruto's relief as ACE Chief was unjustified since this was the first country study produced by the 323rd in five years.

393.    Intelligence products (including country studies) were supposed to constitute yearly deliverables in support of the 66th MI Brigade's mission but had been neglected by the 323rd during its previous period as a nonperforming unit. Exhibit 1(d); Exhibit 1(k); Exhibit 1(l).

394.    That this was the first study produced by the 323rd in five years is a reflection of the nonperforming unit Col. Nell inherited from his predecessor in command, not a point in support of Major Zeruto's tenure as ACE Chief. Exhibit 1(d); Exhibit 1(k); Exhibit 1(l).

395.    Furthermore, as the designation of OIS clearly implies even to a layman, such studies were intended to be "intelligence products" – meaning that they necessarily include classified material.

396.    Despite this obvious fact and unbeknownst to Col. Nell until completion, Major Zeruto instructed her company that the study needed to be unclassified in nature thereby disenfranchising many ACE intelligence functional experts whose contributions could only be made at a classified level and contributing to bad optics of Col. Nell's policies inside Alpha Company.

397.    In short, failure to maintain end to end ownership of the most critical ACE deliverable was a reasonable point of justification for Col. Nell reassigning Major Zeruto to duties having little to do with fieldcraft, intelligence operations, or support to the 66th MI Brigade.

**C.   Major Zeruto's hostile command style and her own complaints as to having too many tasks were also evidence that her removal as ACE Chief was justified; this is exemplified by her failure to perform OERs for four of her subordinates.**

398.    Despite her own laxity in performing her duties, and Col. Nell's deliberate avoidance of permanent records in correcting problematic behavior, Major Zeruto was often severe, demeaning, and overly punitive towards her subordinates.

399.    This can be seen through her immediate push for UCMJ Article 15 punishment for the soldiers who had failed to appear at the correct place, date, and time in part because of Alpha Company and battalion administrative failings, something which would have meant the permanent end to their careers. Exhibit 3(i).

400.    It is also evidenced by her demeaning response to the battalion human resource sergeant who had inquired as to submission of alert roster information and readiness statistics. Exhibit 3(p).

401.    Finally, several full-time permanent staff officers for Alpha Company attested to her demeaning and punitive command style. Exhibit 1(h); Exhibit 1(j).

402.    Col. Nell was also reasonable in using Major Zeruto's own complaints that she was facing too many tasks in his decision to remove her from her position as ACE Chief.

403.    As evidenced by Major Zeruto's continual failure to perform her duties, it was clear that she was ill-suited to the position and unwilling to faithfully discharge its inherent responsibilities..

404.    This was particularly proven by her failure to perform OERs for four of her subordinates.

405.    This left permanent gaps in their records, which would severely impact their promotion prospects moving forward. Exhibit 11.

406.    It is more than reasonable that Col. Nell would take this into account when choosing the next position for Major Zeruto to fill when her two year command tenure of Alpha Company ended on March 20, 2011, following her nineteen months of command and five month absence on leave.

**D.     Special Projects Officer was a proper role for Major Zeruto to fill.**

407.    As established above, Major Zeruto had proven herself to be unwilling or unable to perform the administrative duties necessary for a commander of a large group of subordinates and very unaccepting of responsibilities associated with field problem preparation.

408.    In addition, she had also shown herself to be a harsh and punitive commander, including a direct reprisal against her NCOIC SFC Green via a negative NCOER and cancellation of permission for  early permanent change-of-station (PCS) following  his complaint to the battalion executive officer, and demeaning junior personnel such as SGT Manny Mayfield. Exhibit 1(j); Exhibit 3(n).

409.    However, Col. Nell still respected her military intelligence knowledge, project management competence, and her ability to contribute to long term projects.

410.    One of these projects included all program management activities, including planning, coordinating, resourcing, executing, monitoring, and controlling, necessary to oversee the installation of the Defense Common Ground Station - Army (DCGS-A) into the 323rd's sensitive compartmented information facility, a significant responsibility originally assigned to the battalion executive officer. Exhibit 3(m).

411.    As described above, the DCGS-A can be considered as the "principal weapon system" of the military intelligence soldier, and Alpha Company was non-mission capable without it.

412.    DCGS-A are normally locked in a secure cage, and unavailable for use unless in a deployed environment, meaning that it would be otherwise impossible for ACE personnel to train on the equipment at their home-station.

413.    As detailed above, once successfully completed, the installation would provide a training capability unavailable to most other Reserve military intelligence battalions and this was a massive project, requiring the surmounting of many procedural and security hurdles, as well as significant external liaison, which was well suited to Major Zeruto's experience both in significant project management and in understanding the ACE use-case for DCGS-A.

414.    Written counseling from when she took on the SPO reassignment also explicitly documented Col. Nell's intent that Major Zeruto propose additional projects to grow the SPO portfolio in a manner of her own choosing. Exhibit 12.

415.    Col, Nell clearly intended the SPO reassignment to be substantive and constructive, and for it to be designed to enhance both battalion readiness as well as Major Zeruto's professional growth, while simultaneously accommodating several of her predispositions. Exhibit 12.

416.    To conclude, the DAIG's second finding in DIH 11-6066, that Major Zeruto's shift in position was unjustified, and thus evidence of reprisal, was unsupported by the evidentiary record.

**The 2017 DAIG memorandum upholding its reinvestigation was severely flawed and contained factual mistakes.**

417.    The DAIG review of its investigation based its decision to uphold the results on the following grounds:

   a.    That the purpose of the investigation was not to prove or disprove whether Major Zeruto was a poor or good officer;

   b.    That the factors and conditions cited in support of the second, unfavorable, OER existed prior to the first and had not changed;

   c.    Since these factors and conditions were apparently not found by Col. Nell to be sufficient to result in an unfavorable first OER, they did not justify the change to the second;

   d.    That the timing of the change in the OER thus substantiated that the unfavorable OER was in reprisal for her protected communications;

   e.    That Col. Nell, despite knowing of Major Zeruto's strengths and weaknesses expanded her job responsibilities;

   f.    That this substantiated that her shift to battalion SPO was in reprisal for her protected communications;

   g.    That all the appropriate and relevant witnesses had been interviewed, that the findings were supported by the evidence, and that nothing that Col. Nell had submitted invalidated prior findings.

Exhibit 23.

418.    A particularly important point of evidence cited by the DAIG was that the disastrous first field problem had occurred within Major Zeruto's first OER period, meaning that the conditions existed when Col. Nell gave her a positive assessment. Exhibit 23 at 4(b).

419.    However, as established above, Col. Nell wrote his assessment of Major Zeruto for her first OER significantly *before* the first field problem and for a rating period which was supposed to end prior to the problem. Exhibit 3(c); Exhibit 3(d).

420.    The OER period was extended to March 20, 2010, due to the actions of rating officers senior to Col. Nell, meaning that Col. Nell never had the opportunity to address the first field problem in his assessment of Major Zeruto for that OER. Exhibit 3(d).

421.    This is a significant mistake of fact by the DAIG.

422.    Another, this time, tacit, mistake of fact by the DAIG was in failing to admit that they had been incorrect in their assertion in DIH 11-6066 that Col. Nell had backdated the written counseling dated November 7, 2010.

423.    Although DAIG had, by the time of the ABMCR-directed reinvestigation, abandoned this line of attack, this falsely alleged backdating had been a key piece of evidence which had originally given confidence to the original investigator that reprisal had occurred.

424.    Although refusing to reinvestigate the matter, DAIG should nevertheless have properly taken into account this foundational material original error when determining if DIH 11-6066 was still substantiated.

425.    The next problem with the DAIG's argument is that a finding of reprisal under 10 U.S.C. § 1034 requires finding that an unfavorable personnel action (UPA) was taken *as a reprisal* for making a protected communication.

426.     The reasonableness of the UPA (i.e., Major Zeruto's actual performance) is central to determining the motivation for the UPA, as justification for the UPA is significant evidence that it was done for proper motives, and not as reprisal.

427.    As has been established above, the UPAs taken by Col. Nell against Major Zeruto were more than justified by her litany of neglect of her duties, sabotage of battalion policy and mistreatment of subordinates.

428.    Third, the DAIG's findings that the conditions cited for the second OER were already in existence when Col. Nell made his positive assessment in Major Zeruto's first OER is unsupported by the evidence.

429.     That there was tension between Major Zeruto and Col. Nell is undisputed, but what emerged during the second OER period was Major Zeruto's open insubordination against battalion guidance, neglect of her administrative duties, and extreme treatment of her subordinates.

430.     This is particularly encapsulated by her complete failure to prepare any of the three field problems,, as well as her failure to ensure participation in Austere Challenge.

431.     All of these critical factors in her unfavorable second OER only emerged *during the second rating period*.

432.     In addition, it is important to note that Col. Nell did not give unfavorable ratings to officers with whom he had tension, or even vocal disagreements, he gave unfavorable ratings to officers who *refused to improve* or follow his guidance. *E.g.,* Exhibit 6 at 20.

433.     As has been established previously, Col. Nell always kept the long-term best interests of his subordinates at heart, even when they were extremely difficult or underperforming.

434.     The timing of the change from the favorable first OER to the unfavorable second OER is thus more than justified by the record of Major Zeruto's refusal to perform her duties, and the revelation of the extent to which she intended to sabotage his plans for the reformation and transformation of the 323rd into a top tier unit.

435.     Fourth, DAIG's argument that Col. Nell had previously expanded Major Zeruto's responsibilities, despite knowing her strengths and weaknesses, implies that the less than fully-favorable actions post-protected communication cannot be retroactively justified on the grounds of poor performance that Col. Nell had been aware of pre-protected communication and had apparently rewarded through an expansion in her duties.

436.     This reasoning is not only disingenuous and severely flawed, but it is conclusively refuted by evidence of which DAIG was well-aware at the time of the original investigation.

437.     Col. Nell dual-hatted Major Zeruto as Alpha Company commander and ACE chief at the beginning of her tenure on March 20, 2009, before any performance deficiencies were uncovered.

438.     This decision was made for both valid operational reasons, as attested by Lt. Gen. Daniels, and also to facilitate Major Zeruto's later advancement, since a soldier must be assigned to a billet coded for the next higher grade to receive promotion, and Zeruto (then a captain) was known to be coming due for major. Exhibit 1(k).

439.    Although her performance deficiencies were increasingly recognized by Col. Nell at the time of her promotion (which was pre-protected communication), Col. Nell had neither the authority nor the desire to intervene in the Army centralized selection process.

440.    Thus, Major Zeruto received immediate promotion to major in the ACE chief billet, but without expansion of responsibilities, since she already held those of both company commander and ACE chief as a captain.

441.    This line of argument by the DAIG is not only highly prejudicial, it also continues to perpetuate a known falsehood.

442.    Col. Nell never doubted Major Zeruto's substantial capacities as an intelligence officer. Exhibit 3(p).

443.    However, Major Zeruto proved herself over the course of 2010 and 2011 to be completely incapable or unwilling to perform either the administrative tasks or intelligence field problem preparation required of either the Alpha Company commander or ACE chief .

444.    This included, as noted above, the participation in the planning of field exercises, which she completely refused to do.

445.    This culminated in her severe failure to prepare OERs for a large number of subordinates, which would have significant negative consequences on their promotion possibilities going forward.

446.    This was in line with CW2 Pemberton's assessment that she was uninterested in anything that did not personally benefit her and exemplified a complete disregard for the personal or professional welfare of her subordinates. Exhibit 1(h).

447.    These factors took time to reveal themselves and were not established at the time that Col. Nell competitively selected her for  Alpha Company commander and dual-hatted her as battalion ACE chief in recognition of her competence and preparation for her later promotion to major.

448.    Simply put, he did not have foreknowledge as to how Major Zeruto would later behave.

449.    The DAIG reinvestigation fixated on the alleged preexisting conditions of the tension between Col. Nell and Major Zeruto when her responsibilities were allegedly expanded.

450.    But it is important to stress that Major Zeruto's responsibilities were never expanded, she was dual hatted from the start as commander of Alpha Company and ACE chief.

451.    This was a major factual error by the DAIG during their reinvestigation, as it completely misunderstood the chain of events and this misunderstanding was central to the DAIG's belief during the reinvestigation that the reassignment had occurred in retaliation.

*452.*    In addition, it continues to misunderstand why Major Zeruto was reassigned upon the end of her command tenure of Alpha Company; Major Zeruto was not shifted in position for disagreeing with Col. Nell, she was shifted in position *for refusing to carry out his guidance.*

*453.*    Col. Nell had asked Major Tluczek, the 323rd's executive officer, for options as to what to do with Major Zeruto given her actions towards her subordinates and repeated refusal to perform her duties.

*454.*    Major Tluczek recommended either relieving her immediately or reassigning her as the battalion SPO.

*455.*    Col. Nell decided to reassign her as SPO, and to defer doing so until the end of her command tenure of Alpha Company on March 20, 2011.

456.    That Col. Nell still had a clear view of the competence of his subordinates even when they very vocally disagreed with him is a point to his credit, not evidence that he only took UPAs when he wished to reprise against them. Exhibit 3(p).

457.    In addition, it should also be noted that Col. Nell refused to relieve her, which would have meant the end of her career, despite his executive officer specifically recommending this as an option.

458.    Even after all of Major Zeruto's actions, Col. Nell still sought a way for her to continue her career and to contribute to the Army.

459.    This argues strongly against the idea that he was retaliating against her.

460.     In short, the DAIG reinvestigation not only made several serious factual errors, but its findings were not backed by the evidentiary record, and it should never have been upheld by the ABCMR.

**For the reasons laid out above, the ABCMR's decision in AR20180001145 to uphold the DAIG's findings, both in DIH 11-6066 and the reinvestigation, was unsupported by the record and thus arbitrary and capricious.**

461.    The Administrative Procedure Act, 5 U.S.C. § 706, permits the setting aside of agency decisions when they are arbitrary and capricious.

462.    Agency decisions are arbitrary and capricious when they run counter to the evidence before it. *Doe v. United States Citizenship & Immigration Services*, 239 F. Supp. 3d 297, 306 (D.D.C. 2017).

463.    As has been well established above, the ABCMR's decision to uphold the findings both of DIH 11-6066, as well as the 2017 DAIG review of DIH 11-6066, clearly ran counter to the evidence in the record before it.

464.    This is supported by the actions of the ABCMR itself; after showing significant concerns with DIH 11-6066 in its AR20170003673 decision, ABCMR returned Col. Nell back onto the Colonel/O-6 selection list and simultaneously backdated his promotion by four-years to 2012, when it would have originally occurred, absent the DAIG findings.

465.    The decision in AR20180001145 to uphold the findings, to not find that they reflected a gross error or injustice, and to not to expunge them is thus arbitrary and capricious and should be set aside.

466.    In addition, as has also been established above, the decision in AR20190001156 to hold that the ABCMR lacked the legal authority to set aside whistleblower reprisal findings was clearly contrary to the law.

**For the purposes of judicial economy, it is best to pause this matter for one last act of reconsideration.**

467.    Despite the Plaintiff's belief that his claim that the ABCMR's action was arbitrary and capricious is more than substantiated, he still believes that this matter remains within the expertise of the ABCMR.

468.    In addition, should the Court find that the ABCMR's action is arbitrary and capricious, this matter would still require resubmission to the ABCMR, as a finding of arbitrary and capricious decision making only sets aside the decision.

469.    As such, in the interest of judicial economy, the Plaintiff believes that this matter would be best resolved through an order setting aside the Board's determination in AR20190001159 that they lacked the authority to set aside whistleblower findings as contrary to the law, staying this matter, and remanding the question to the ABCMR for one final reconsideration of their decision to refuse to expunge the findings of DIH 11-6066.

470.    This should be accomplished within two (2) months, including joint status updates by the parties every two (2) weeks.

471.    Should the ABCMR stand by their initial decision, then this case should then be reopened, and the Plaintiff should be granted leave to change his request for relief to

requesting an order declaring that the ABCMR's decision to refuse to expunge the findings of DIH 11-6066 was arbitrary and capricious.

## Claim for Temporary Injunctive Relief

**28 U.S.C. § 1361**

**Claim 3:** **This Court should temporarily enjoin Col. Nell's removal from the FY2020 Order of Merit List for promotion to Brigadier General / O-7 while the matter is remanded to the ABCMR.**

472.   Under 28 U.S.C. § 1361 this Court has the authority to order an officer of the United States to perform their duty.

473.   As stated above, Col. Nell has attested as to his substantiated knowledge or belief that he is on the current Order of Merit List for potential promotion to Brigadier General/O-7. Exhibit 17.

474.   As has been noted previously, the two wrongful findings that he engaged in whistleblower reprisal have previously delayed his otherwise earned promotion to Colonel, which required ABCMR action to reinstate and backdate this promotion.

475.   A finding of reprisal effectively eliminates the possibility for any GOVPB/GOAAB selected Colonel to be nominated for Senate confirmation and thus precludes promotion to Brigadier General/O-7 for any officer.

476.   The members chosen for placement on the current OML for Brigadier General/O-7 promotion will be supplanted by those chosen for the Order of Merit List for potential promotion for FY2022 at the beginning of 2022.

477.   Col. Nell would ordinarily not be eligible for retention on the Order of Merit list when the current members are supplanted by those selected for consideration in FY2022.

478.   Col. Nell thus requests that this Court issue a temporary injunction preventing his removal from the Order of Merit List of officers eligible for nomination to the Senate for confirmation as Brigadier General when the current members of the list are supplanted by the officers chosen for consideration in FY2022.

479.   A temporary injunction requires a Plaintiff to establish that:

a.   The Plaintiff is likely to prevail on the merits of the case;

b.   The Plaintiff will suffer irreparable harm if not granted;

    c.  The threatened injury to the Plaintiff outweighs the harm which may come to the enjoined party; and

    d.  Injunction is merited based on the balancing of the equities.

*Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C., 2020).

480.    First, as has been established above, Plaintiff is more than likely to prevail in his claim that the ABCMR has the statutory authority to set aside inspector general whistleblower findings and that its upholding of the findings in his matter was arbitrary and capricious.

481.    These same wrongful inspector general whistleblower findings have foreclosed any opportunity for the Plaintiff to be selected by the Senate for promotion to Brigadier General.

482.    Second, Plaintiff will suffer irreparable harm if removed from the Order of Merit list, as a failure to be promoted by June 1, 2022, will end his career due to mandatory "up or out" retirement.

483.    Removal from the Order of Merit list would foreclose any possibility for promotion in FY2022, meaning that Plaintiff would have no opportunity to avoid his mandatory retirement date of June 1, 2022.

484.    Third, the threatened injury to the Plaintiff in the form of the end to his career more than outweighs the possible harm to the Army in keeping him available for potential promotion for a longer period of time.

485.    In fact, this will significantly benefit the Army, by ensuring that Plaintiff can continue to apply his well-regarded capacities to even more significant tasks.

486.    Injunction is merited on the balance of the equities because to allow such an outstanding officer to have his career badly hampered by wrongful findings of reprisal would be deeply unjust, while retention of the Plaintiff on the active Order of Merit List would have no negative impact on the Army.

## **Conclusion**

WHEREFORE, the Plaintiff humbly requests that this Court issue an order:

1)    Overruling and setting aside the ABCMR's decision AR20190001156, dated October 7, 2019, holding that the ABCMR lacked the authority to expunge Inspector General findings as to whistleblower retaliation;

2)    Remanding this matter to the ABCMR for reconsideration of its findings upholding the DAIG's reevaluation of the 2013 Inspector General Report in AR20180001145;

3)    Ordering the ABCMR to complete its reconsideration within two (2) months;

4)     Requiring the parties to file joint status reports every two (2) weeks as to the status of the remand;

5)     Staying this matter, pending remand;

6)     Granting the Plaintiff permission to amend his requested relief, once the decision is reached on reconsideration by the ABCMR, to request that said decision be set aside under the A.P.A., should the ABCMR again refuse to correct Plaintiff's records;

7)     Enjoining the removal of Plaintiff from the active Order of Merit List for promotion to Brigadier General, should he be on it, when the members selected for consideration in FY2020 list are supplanted by those selected for consideration in FY2022.


                              Respectfully submitted,

                              */s/DavidP.Sheldon*

                              David P. Sheldon (DC Bar # 446039)
                              Law Offices of David P. Sheldon, P.L.L.C.
                              100 M. St. SE, Suite 600
                              Washington, DC 20003
                              Tel: 202.546.9575
                              Fax: 202.546.0135
                              *Attorney for Petitioner*



Dated: December 10, 2021.

**Exhibit List:**

1:      Memoranda for Records.

2:      Chronological Evidence Map

3:      Collected emails.

4:      Tables for the manning of Austere Challenge and recording field exercise results.

5:      Counseling Statement Dated November 7, 2010.

6:      DIH 11-6066.

7:      Developmental Counseling Form dated October 18, 2010.

8:      DIH 11-6066 Roll Case Exhibit F.

9:      Army Regulation 600-20 (2008).

10:     Field Manual 6-22 (2006).

11:     Memorandum for Record of Lt. Ashley Coates, dated March 20, 2011.

12:     March 20, 2011, Counseling Statement on Reassignment to Battalion SPO.

13:     2014 Department of Defense Inspector General Appeal Decision.

14:     2014 Promotion Review Board Decision.

15:     2014 Command Review Board Decision.

16:     Officer Record Brief of Col. Karl E. Nell.

17:     Affidavit of Colonel Karl E. Nell.

18:     Letters of Endorsement for Promotion to Colonel for Colonel Karl E. Nell.

19:     AR20150003964.

20:     AR20160002635.

21:     2016 Advisory Opinion from the Army Human Resources Command.

22:     AR20170003673.

23:     2017 Department of the Army Inspector General Reinvestigation.

24:     AR20180001145.

25:     AR20190001159.

26:     House Report No. 114-840 (2016).

27:     2nd Officer Evaluation Report for Major Zeruto.

28:     Officer Evaluation Reports for Colonel Karl E. Nell.